IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

THE BOSTON CONSULTING GROUP, INC.,

Plaintiff,

-v.-

NCR CORPORATION,

Defendant.

Civil Action No.
_____

JURY TRIAL DEMANDED

## COMPLAINT

Plaintiff The Boston Consulting Group, Inc. ("BCG" or "Plaintiff"), as and for its complaint against Defendant NCR Corporation ("NCR" or "Defendant," and together with Plaintiff, the "Parties"), hereby alleges, based on knowledge as to its own conduct, and on information and belief as to all other matters, as follows:

## NATURE OF THE ACTION

1.      BCG's action against NCR is straightforward: under a written contract between the Parties, BCG delivered to NCR world-class services that led to exceptional results in the form of profit improvements over a two-and-a-half year period in one of NCR's three main lines of business.  NCR now refuses to pay its contractual debts after it accepted the benefits of BCG's substantially completed performance.  After months spent attempting to engage NCR over its having welched on its payment obligations, BCG has no choice other than to commence this lawsuit.

2.      More specifically, and as discussed in detail below, NCR is obligated to pay BCG in excess of $80 million for BCG's work to improve NCR's Field Services Business unit ("Services" or the "Services Business"), a project known as Mission One.  For over two years,

NCR knowingly accepted the services of more than 100 BCG professionals and now is reaping the benefits of BCG's revitalization of NCR's once-dying Services Business. BCG's multi-year effort should generate in excess of $200 million in profit by end of Q4 2019 and could deliver over time in excess of $1 billion in value to NCR's Services Business. BCG achieved these results despite the fact that NCR acted in contravention of its contractual commitment to provide the financial, personnel, and governance support for the project that the Parties had agreed to at the outset of the engagement.

3.     NCR itself repeatedly touted the results achieved by BCG's Mission One efforts in Securities and Exchange Commission ("SEC") filings and recorded conference calls with analysts. For example, in its Form 10-Q for the quarter ended June 30, 2018, filed with the SEC on August 3, 2018, NCR stated:

> We continue to evaluate and implement programs to prioritize driving margin improvement. In Services, our Mission One performance and profit improvement program is focused on transforming NCR's service margin profile through i) productivity and efficiency improvements; ii) remote diagnostics and repair; iii) product life cycle management; and iv) a higher mix of managed services.
>
> In Services, our Mission One performance and profit improvement program continues to deliver revenue growth and margin expansion.

4.     In NCR's Form 8-K filed on July 26, 2018, NCR explained, "Our previously announced restructuring and transformation initiatives continue to progress on track. In Services, our Mission One performance and profit improvement program continues to deliver revenue growth and margin expansion."

5.     Likewise, during a Q3 2018 earnings call on October 30, 2018, NCR's Chief Executive Officer ("CEO"), Michael Hayford, commented:

> [T]he consistent implementation of our [Mission One] initiative is driving further margin expansion in Services as gross margin

reached 26.8% in the quarter, up 70 basis points compared to last year.  Improving our margin profile in Services will remain a key priority.

****

So the way you should look at it is there is 3 distinct efficiency streams going on, the Services, [Mission One] that we've announced in the past continue to execute.  And you can see the benefits for the [Mission One] initiative in the Services numbers each quarter.  And we're continuing to make progress, continuing to get margin expansion.  And more importantly, our customer sat[isfaction] numbers are continuing to improve in that area.

6.      As NCR contemporaneously told its investors, the Mission One program is an unqualified success accruing to NCR's benefit.  To the extent NCR argues to the contrary, NCR either repeatedly misrepresented to regulators and the market the improvement in the Services Business brought about by BCG and its Mission One efforts, or it is lying now.  Both cannot be true.  As BCG alleges herein, NCR simply does not want to pay its debts—for BCG's work and resulting achievements on Mission One.

7.      Specifically, the vast majority of BCG's compensation under its agreement with NCR (the "Statement of Work" or "Contract," dated June 22, 2017, attached as Exhibit A) was contingent on whether, and to what extent, the Services Business improved over an agreed-upon "baseline" profit figure.  In other words, due to NCR's financial condition and performance at the time, BCG accepted the significant economic risk that it would be paid for only a fraction of its work on the project in the event the Services Business did not meaningfully improve during the term of NCR's partnership with BCG.  On the other hand, in what the Parties' Contract characterized as a "win-win" scenario, if BCG's work *did* meaningfully improve the financial performance of the Services Business during the Contract term, then BCG would be fairly compensated for its effort.

8.      Now that BCG has substantially completed performance under the Contract and NCR is enjoying the fruits of BCG's labor, NCR apparently has decided, in effect, to eliminate one prong of the "win-win" scenario contemplated by the Parties when they signed the Contract. Now, NCR argues that it alone should "win" from BCG's work while BCG "loses" in that it is being treated, contrary to NCR's reported financial performance, as if its efforts to transform the Services Business failed.

9.      In order to remedy NCR's misconduct and recover what BCG has earned and is owed under the Contract for over two years of hard and successful work, BCG has filed this action.

*                    *                    *

10.      BCG is one of the world's top management consulting firms.  The firm employs over 10,000 consultants and 20,000 employees, and offers a wide array of management consulting services to large corporations and organizations around the world, counting among its clients the most prestigious organizations in virtually every industry and geography.  Consultants from numerous BCG practice areas worked on the NCR engagement, including in the areas of operations; strategy; marketing, sales and pricing; corporate finance and strategy; people and organization; global advantage; transformation and large scale change; technology advantage; and digital.

11.      Founded in 1884, NCR is a manufacturing company best known for its ATMs, point-of-sale (POS) terminals, bar code scanners, associated printer consumables such as paper and ink, as well as related software services.  NCR has three main business units: (i) hardware, (ii) software and (iii) Services, which provides client services in relation to the installation, implementation, maintenance, and support of NCR's various hardware and software

products.  Given changes in demand and technology, NCR has shifted its focus to attempting to bolster its ailing Services Business.  The Services Business is comprised of an approximately 17,000 person workforce and accounts for approximately one-third of NCR's total revenue and cost base.

12.     In Fall 2016, Mark Benjamin joined NCR as President and Chief Operating Officer ("COO").  Mr. Benjamin left his previous role as President of Global Enterprise Solutions at Automatic Data Processing, Inc. ("ADP"), where he had worked for over a decade, to become President and COO of NCR with the expectation that he would help guide NCR through a shift in focus from hardware to software and, eventually, succeed the long-time CEO, William ("Bill") Nuti.

13.     Shortly after joining NCR, Mr. Benjamin and Jeffrey Kotzen, a Senior Partner at BCG, began discussing how BCG could help improve certain NCR business operations. Mr. Benjamin and Mr. Kotzen had worked together on successful projects during Mr. Benjamin's tenure at ADP.

14.     Soon thereafter, Mr. Kotzen, along with a team of approximately 10 consultants, spent eight weeks—at no charge to NCR—reviewing and analyzing the Services Business (the "Diagnostic"), concluding this effort in March 2017.  The Diagnostic showed that, despite the previous efforts of two other consulting firms, the Services Business was severely struggling due in large part to the failure of NCR to intelligently or sufficiently invest personnel and financial resources in the business, and that there was significant room for improvement that could be realized with the assistance of BCG.

15.     BCG agreed to partner with NCR to transform Services into a thriving business—a proposal that eventually developed into Mission One, as memorialized in the

Statement of Work.   The Statement of Work described Mission One as "an end-to-end Transformation Program beginning in Q2 of 2017 and continuing through to the end of Q4 2019 that will transform Services and make it a world-class business, with a strong value proposition, that is a source of advantage for NCR."

16.     The Statement of Work further outlined, among other things, BCG and NCR's vision and objectives for Mission One, the Parties' obligations to each other, and the fee structure the Parties agreed would govern the project.

17.     Notably, BCG forewent its usual fee-for-service payment structure and instead offered to complete Mission One over the next 2.5 years for $8 million in fixed fees (a fraction of the value of its services given the resources and time a project like Mission One would require) in addition to a "gain sharing payment" that depended on the success of BCG's efforts in revitalizing the Services Business (the "Risk/Gain Sharing Fee").

18.     With respect to the Risk/Gain Sharing Fee, BCG's compensation is calculated as a percentage of the Services Business' adjusted gross margin ("AGM") improvement ("AGMI") in relation to a contractual baseline adjusted gross margin ("BAGM") figure, defined in the Contract as $608.5 million.  The $608.5 million BAGM was developed and proposed by NCR and agreed to by BCG.  AGM, in turn, is the Services Business' quarterly gross margin plus or minus express adjustments laid out in the Contract.  By virtue of this arrangement, the vast majority of BCG's potential compensation for Mission One was contingent on how much, if at all, NCR's Services Business improved during the Contract term.  BCG's fees were structured such that BCG would earn the bulk of its compensation in 2019 after BCG and NCR implemented the program.  Accordingly, it was crucial that both BCG and NCR agreed on the financial targets for the Services Business.  At the outset of the Contract, the Parties discussed and agreed that with the

implementation of BCG's proposed initiatives, the Services Business could attain $250 million in AGMI by the end of Mission One, an approximately 40% profit improvement over the baseline. The Parties set $250 million in AGMI as the key financial goal for Mission One, at the urging of NCR, and structured a significant portion of BCG's fees around that goal.

19.     However, despite encouraging BCG to strive for the $250 million improvement in AGM and providing BCG repeated assurances that it intended to abide by the Contract, NCR instead disregarded its monetary and non-monetary obligations under the Contract at every turn.

20.     *First*, in recognition of the significant risk that BCG was taking, the Contract required NCR to "operate as a partner" to BCG, meaning, among other things, that NCR was required to (i) participate in two governance committees comprised of senior BCG and NCR personnel created to oversee the progress of Mission One, (ii) provide BCG a "seat at the table" with NCR's and the Services Business' leadership teams, and (iii) have BCG participate in Services and NCR senior leadership meetings.

21.     The two governance committees – the Services Transformation Steering Committee (the "Steering Committee" or "SteerCo") and the Gross Margin Improvement Review Committee (the "GMI Review Committee") – were essential components of the BCG-NCR relationship required for Mission One because they were the forums the Parties created to jointly manage the program towards a win/win outcome, including resolving issues concerning the implementation and success of the program as well as the amount of fees due to BCG each quarter. For most of the Contract term, NCR refused to participate on the Steering Committee or the GMI Review Committee, thereby thumbing its nose at the bedrock governance principles it agreed to in the Contract.

22.     NCR's disregard for its obligation to participate in the Mission One committee structure coincided with Mr. Benjamin's announcement, in March 2018, that he was resigning from NCR to become CEO of Nuance Communications, Inc. ("Nuance").  Around the same time, Mr. Nuti, NCR's long-tenured CEO who negotiated and signed the Statement of Work on NCR's behalf, announced that he was stepping down as CEO after thirteen years.  From the time of those key departures in March through September 2018, despite repeated attempts by BCG, BCG had almost no contact with NCR's new leadership, whether through the Steering and GMI Review Committees or otherwise; the partnership that the Parties envisioned in the Statement of Work (and the close relationship that BCG and NCR had while Mr. Benjamin was at NCR) was virtually non-existent.

23.     It is difficult to overstate the hurdles created by NCR's most senior executives' unwillingness to participate in Mission One in violation of NCR's contractual obligations.  BCG understood from the Diagnostic that in order to achieve the Parties' goal of transforming the Services Business in just two years, it necessarily required financial and cultural buy-in from NCR's CEO, President, COO, Chief Financial Officer ("CFO"), and the Services Business' leadership as well as its employees, and an open line of communication between the Parties to promptly resolve issues as they arose.  By refusing to give BCG any opportunity to discuss such issues, NCR effectively left BCG in the dark to work with employees who were either unhelpful or resistant to providing BCG with the information or resources they needed to efficiently implement the Mission One initiatives.

24.     *Second*, the Contract required NCR and BCG to prioritize the program in order to maximize the gross margin growth of the Services Business.  In furtherance of this goal, the Contract required NCR to ensure that a meaningful percentage of its Services executives'

bonuses were linked to the AGMI of the Services Business (in other words, to provide a financial carrot that would serve as an incentive for Services leadership to prioritize and support Mission One).  NCR also reneged on this obligation, including by withholding resources and not linking a meaningful percentage of its Services executives' bonuses to the Services Business' gross margin improvement to align with Mission One's goals as required under the Contract.

25.     *Third*, the Contract required NCR to pay BCG for its work on Mission One. The Contract not only explicitly spelled out that NCR would pay BCG fixed fees and the Risk/Gain Sharing Fee, but also set forth multiple mechanisms to ensure the Parties were aligned on payment, including requiring NCR to provide BCG with certain financial information and mandating that NCR and BCG representatives participate in the GMI Review Committee that was designed to oversee calculation of AGMI.  NCR failed to do so.

26.     Pursuant to the Statement of Work, the Risk/Gain Sharing Fee is payable each quarter based on that quarter's results and there is no legitimate dispute that BCG has earned and is entitled to substantial Risk/Gain Sharing Fees.  BCG submitted invoices for Risk/Gain Sharing Fees in December 2018 (for Q2 and Q3 2018), March 2019 (for Q4 2018), and May 2019 (for Q1 2019).  NCR's head of Services, Robert Ciminera, agreed to each of these amounts and promised prompt payment.  Accordingly, BCG uploaded the invoices in NCR's online payment portal for payment.  At some point, however, NCR cancelled the invoices in the online payment queue and, to date, none of these invoices has been paid.

27.     Then, in mid-August 2019, for the first time, and contrary to its repeated representations to the contrary, NCR expressly stated that it did not intend to honor its payment obligations under the Contract.  Specifically, on August 19, 2019, James Bedore, NCR's General Counsel, sent a short email stating vaguely that NCR disputed the amounts BCG claimed were due

and that all NCR would pay was approximately what it already had paid, *i.e.*, the fixed fees under the Contract, with no additional payment toward the contingent Risk/Gain Sharing Fee.  A one-page Excel spreadsheet attached to Mr. Bedore's email purporting to provide support for NCR's position in fact revealed that NCR was blatantly attempting to distort the AGMI calculation in a manner inconsistent with the express terms of the Contract and the Parties' discussions of AGMI (to the minimal extent they occurred) during the Contract term.

28.    Presently, NCR owes (and has refused to pay) the amounts the Parties agreed were due to BCG under the Risk/Gain Sharing Fee for Q2 and Q3 2018 ($872,000 for Q2, $1,205,000 for Q3, approximately $2.1 million total), Q4 2018 ($5.4 million), and Q1 of 2019 ($4.339 million), which together total $11.839 million, subject to further determination regarding certain one-time adjustments that had not been agreed upon.  NCR further owes BCG Risk/Gain Sharing Fees for Q2, Q3, and Q4 of 2019.  Although NCR stopped providing BCG with financial information in mid-2019 in violation of the Contract, BCG estimates that it is entitled to more than $80 million, depending on the performance of Mission One through the remainder of 2019.

### THE PARTIES

29.    BCG is a Massachusetts corporation with its principal place of business in Boston, Massachusetts.  Founded in 1963, BCG has approximately 20,000 employees, including 10,000 consultants, in over 90 offices across more than 50 countries and generates over $7.5 billion in revenue annually.  BCG offers expertise in a broad range of industries including all key industries and functions relevant to NCR's Services Business.  BCG's clients include many of the world's largest organizations.

30.    BCG has consistently been recognized both for the excellence of its work and the opportunities it provides to its employees.  Among the many accolades it has received,

BCG ranked number one on Consulting magazine's "Best Firms to Work For" in 2018 for the fifth consecutive year (and has been in the Top 5 every year since it started this ranking in 2001). BCG also ranked in the top ten of FORTUNE "100 Best Companies to Work For" in 2019 for the 11th consecutive year and received a perfect score on the Corporate Equality Index in 2019, which recognizes equality for lesbian, gay, bisexual, and transgender employees, for the 12th consecutive year. BCG was ranked third on Glassdoor's Best Places to Work list for 2018 and earned Glassdoor Employees' Choice Award, which relies solely on the input of employees. In 2019, Vault.com Inc. named BCG as one of the top three consulting firms in North America. In 2017, Business Insider ranked BCG in the top three major consulting firms in the world. BCG won the "All Star" award in 2017 from the International Association of Outsourcing Professionals (IAOP) for the second year in a row, earning perfect scores in six of nine judging categories for its 2017 Global Outsourcing 100 program. In 2018, BCG was one of four companies recognized by Catalyst, a nonprofit that helps build workplaces that work for women. The National Association for Executive Women also rated BCG among the top American corporations that have promoted women to executive positions and created a culture that identifies, promotes, and nurtures the careers of talented women.

31.     NCR is a Maryland corporation with a principal place of business in Atlanta, Georgia.

## JURISDICTION AND VENUE

32.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1) because there is complete diversity of citizenship among the Parties and the matter in controversy exceeds the sum or value of $75,000.

33.     This Court has personal jurisdiction over NCR, and venue is appropriate in this District, because (i) NCR regularly conducts business in the state of New York and derives substantial revenue through that business, and (ii) pursuant to the Statement of Work: "[t]he parties agree to submit to the exclusive jurisdiction of the courts of the state or federal courts located in the State of New York and New York County in the United States."

## STATEMENT OF FACTS

### A.     The Genesis of Mission One

34.     In 2016, Mr. Benjamin became President and COO of NCR, with the expectation that he would ultimately succeed the then-longtime CEO, Mr. Nuti.

35.     At NCR, Mr. Benjamin identified opportunities for improvement.  Through the course of several meetings between Mr. Benjamin and Mr. Kotzen, some attended by members of their respective teams including Mr. Nuti, Andrea Ledford (Chief Human Resources Officer at NCR), Guy Gilliland (Senior Partner at BCG) and Rishi Varma (Managing Director and Partner at BCG), BCG identified four areas of potential improvement in NCR's business operations, one of which was the Services Business.

36.     Mr. Benjamin, Mr. Nuti, and Ms. Ledford agreed that despite having engaged other consulting firms to analyze NCR's Services Business in the past, the business was performing well below its potential.

37.     As a sign of its desire to help NCR transform its Services Business, BCG sent a team of 10 consultants and analysts to conduct the eight-week Diagnostic in order to understand the Services Business, including identifying areas of under-utilization and developing key targets and initiatives—all at no cost to NCR.

38.     The Diagnostic revealed that NCR's Services Business was a severely neglected, under-performing business—in the bottom decile of the services businesses in comparable field services organizations—that lacked basic technological and structural capabilities such as a comprehensive performance management system, contract management and pricing tools, or data analysis programs to strategically assess hardware maintenance and repairs. Rather, NCR had made limited investments in human and financial capital, equipment, and other Services resources, and the business was comprised of a long-tenured staff, many of whom were ill-suited to their jobs or resistant to helping implement significant changes in the business.

39.     The Diagnostic further revealed that a root cause of the Services Business' under-performance was NCR's top-down culture that stressed short-term goals, focused primarily on quarter-end results, and engaged in drastic cost-cutting efforts, including reneging on earned employee bonuses, in order to meet Wall Street earnings guidance.  Furthermore, BCG found that the capabilities of the Services organization were dramatically inferior to many other services organizations.  For example, the NCR Services organization lacked an effective Performance Management system for their field technicians.

40.     In collaboration with the leadership of NCR's Services Business, BCG used the fact base it developed to structure a proposal to present to Mr. Benjamin and Mr. Nuti.  The proposal identified initiatives that would facilitate long-term, sustainable growth, including instituting a comprehensive performance management program, putting in place processes to improve machine performance and optimize repair times, and reducing unnecessary spending. BCG predicted that through implementation of these initiatives, it could help NCR transform the business and achieve significant gross margin improvement by Q4 2019.

41.     In response, Mr. Nuti and other members of NCR's management sought an ambitious $250 million AGMI target by the end of Q4 2019.  Mr. Nuti, Mr. Benjamin and Mr. Kotzen, who would be one of two BCG Senior Partners leading the Mission One effort, discussed that it was critical to transform the Services Business in a meaningful way, and that a $250 million improvement target would help achieve that goal.  This proposal formed the foundation for Mission One.

42.     Mr. Benjamin informed Mr. Kotzen, however, that due to NCR's financial and operational challenges, it only had $4 million in its 2017 budget to spend on consulting services on the Services Business.  In an effort to find a workable solution so it could begin to help NCR immediately, BCG proposed a risk/gain fee structure in which BCG agreed to tie the majority of its fees to financial milestones.

43.     Under the proposed fee structure, each quarter BCG would be entitled to a percentage of the increase for that period in the adjusted gross margin of NCR's Services Business at certain AGM thresholds.  Aside from a relatively modest fixed fee, NCR would only pay BCG soon after each quarter during the Contract when AGM improved.  This fee structure was primarily negotiated by Mr. Benjamin and Mr. Nuti for NCR and Mr. Kotzen for BCG.  All Parties believed that it created a positive risk sharing dynamic where the incentives of each side were aligned and where "BCG does not win unless NCR wins."  The Parties touted this arrangement as a "win-win situation" for everyone.  The Parties recognized that the Risk/Gain Sharing Fees "could cumulatively add up to $71.5 million, beyond the Fixed Fee payments."

44.     The proposed fee structure would also enable NCR to remain profit/loss neutral or positive for the duration of the program, and allowed NCR to pay BCG minimal Risk/Gain Sharing Fees until NCR saw $100 million of profit improvement in relation to BAGM.

45.     On April 28, 2017, BCG reached an agreement in principle with Mr. Benjamin and Mr. Nuti on the commercial terms of the project.

46.     Shortly thereafter, on May 8, 2017, BCG and its Services Business leadership team officially launched Mission One.  Approximately 40 BCG employees, including experts and senior advisors, began working alongside NCR employees to implement the program.

**B.      The Statement of Work**

47.     The Statement of Work contains provisions setting forth, among other things, (i) the objectives of Mission One; (ii) resources both BCG and NCR agreed to commit to Mission One; (iii) BCG's fee structure; (iv) governance structures, which required both BCG's and NCR's engagement and participation; and (v) the methods of termination and calculation of any termination fees.

48.     *First*, the Statement of Work confirmed that the ultimate "vision" of Mission One was to build a "world-class business," including by making the Services Business a source of "top-line growth and margin expansion for NCR, driven by a strategic focus on cost and revenue improvement" as well as a source of "competitive advantage for NCR and a compelling value proposition for its clients."

49.     *Second*, the Statement of Work stressed that in order for the Parties to achieve this objective, BCG and NCR needed a "one team" approach.  Particularly in light of what BCG's Diagnostic revealed about NCR's systemic neglect of its Services Business, the Statement of Work contained provisions recognizing that "[i]n order to realize our shared vision, [BCG and NCR] must operate as a true NCR/BCG partnership" that required (i) "NCR and BCG team members [to] work shoulder-to-shoulder"; (ii) NCR to commit to putting its "very best talent on the program"; and (iii) BCG to, likewise, commit to assigning its "very best talent on the program."

The Statement of Work further required NCR to "prioritize the program[,]" and "to provide timely and accurate support" for the program, including executives who would ensure cooperation, full and direct access to Services' systems, access to NCR's staff, and reasonable investments to fund Mission One programs and initiatives.

50.     *Third*, the Statement of Work set out how BCG would be compensated for its work on Mission One.  BCG's fees would consist of three components: (i) a fixed fee (the "Fixed Fee"); (ii) the Risk/Gain Sharing Fee; and (iii) a qualitative performance assessment discretionary bonus (the "Qualitative Bonus").

51.     With respect to the Fixed Fee, NCR agreed to pay $4 million in each of 2017 and 2018.  The 2017 $4 million Fixed Fee would "be invoiced in four equal tranches of $1 million" on August 25, 2017, September 1, 2017, October 1, 2017, and November 1, 2017.  The 2018 $4 million Fixed Fee would similarly "be invoiced in four equal tranches of $1 million on the first day of each calendar quarter; beginning January 1, 2018."  The Fixed Fee represented a fraction of the total fees BCG would have collected if BCG charged its standard fees, which, to date, would exceed $100 million.

52.     With respect to the Risk/Gain Sharing Fee—the primary source of BCG's compensation should its efforts prove successful—NCR agreed to make quarterly payments based on the amount, if any, that the Services Business improved as measured by AGMI as of each quarter end.  The Statement of Work provided explicit direction as to how that figure was to be calculated.

53.     As set forth in the Statement of Work, the "basis for the risk/gain sharing fee calculations will be 'realized' (i.e., as it hits the P&L) trailing twelve months ("TTM") AGM in any quarter compared to the Baseline AGM."  For example, for Q4 2018, the calculation would

work as follows: the AGM improvement as of Q4 2018 would be the TTM AGM for Q4 2018 less the Baseline AGM, which in turn was an agreed upon figure of $608.5 million.

54.     BCG and NCR agreed—as reflected in the Statement of Work—that AGM for purposes of calculating the Risk/Gain Sharing Fee would, "for NCR's Services business:" (i) exclude depreciation and amortization; (ii) reverse/normalize for the impact of foreign exchange rate impacts; (iii) reverse/normalize for one time/non-recurring charges/write-offs/investments, BCG fees/expenses and corporate allocations; (iv) adjust on a pro forma basis for acquisitions and divestitures; and (v) adjust for any one-time or out-of-period adjustments.  The purpose of these adjustments was to ensure that the AGM accurately reflected improvement in the Services Business.

55.     Exhibit 13 in the Statement of Work included a detailed breakdown of the AGM calculation:

| REVENUE: | | |
|---|---|---|
| IMPLEMENTATION SERVICES | + | |
| INSTALLATION SERVICES | + | |
| CABLING & POWER PROTECTION | + | |
| **TOTAL TRANSACTION SERVICES** | **= A** | |
| | | |
| HW MAINTENANCE REVENUE | + | |
| THIRD PARTY NON-CORE REVENUE | + | |
| TIME AND MATERIALS | + | |
| MANAGED SERVICES | + | |
| PARTS | + | |
| DEPOT REVENUE | + | |
| **TOTAL HARDWARE MAINTENANCE** | **= B** | |
| | | |
| **TOTAL CUSTOMER SERVICES REVENUE** | **= C = A + B** | |
| | | |
| INDIRECT LABOR ALL OTHER | + | |
| INDIRECT LABOR BUFFER | + | |
| INDIRECT LABOR OVERTIME PREMIUMS | + | |
| IND LABOR VARIABLE COMPENSATION | + | |
| DIRECT LABOR COMPENSATION (MFG) | + | |
| | | |
| EQUIPMENT INSTALLATION & RIGGING | + | |
| FAULT PREVENTION & BREAKFIX MAINT | + | |
| FIELD SERVICES MATERIALS | + | |
| MAINTENANCE (PRODUCTION) | + | |
| FEES MINUS CONSULTING | + | |
| | | |
| CASH-IN-TRANSIT | + | |
| SECURITY - ALL OTHER | + | |
| OTHER LEASES & RENTALS | + | |
| | | |
| TRAVEL | + | |
| TECHNOLOGY (INTERNAL USE) | + | |
| PEOPLE HR | + | |
| REAL ESTATE LEASES & RENTALS | + | |
| TECHNOLOGY (GO TO MARKET) | + | |
| UTILITIES | + | |
| SALES | + | |
| FACILITIES | + | |
| | | |
| 3RD PARTY PART SALES | + | |
| 3RD PARTY REPAIR | + | |
| CE SERVICE TOOLS & CONSUMABLES | + | |
| SERVICE PART USAGE & REP ALL OTHER | + | |
| TRANSPORT | + | |
| WAREHOUSING | + | |
| | | |
| PRODUCT GUARANTEES | + | |
| SC LOSSES & MAT DISP - ALL OTHER | + | |
| **TOTAL COSTS** | **= D** | |
| | | |
| **ADJUSTED GROSS MARGIN** | **= E = C - D** | |

56.     After AGMI had been calculated, the Parties would determine the amount

BCG would be entitled to under the Risk/Gain Sharing Fee:

- For $0-50M AGMI, BCG's Risk/Gain Sharing Fee percentage is 0%

- For $50-100M AGMI, BCG's Risk/Gain Sharing Fee percentage is 5%

- For $100-130M AGMI, BCG's Risk/Gain Sharing Fee percentage is 30%

- For $130-250M AGMI, BCG's Risk/Gain Sharing Fee percentage is 50%

## Overview of TURN commercial structure details

correspond

the Parties

| Tranches | | Services Gross Margin Improvement ($M) | BCG Risk / Gain Sharing Fee (%) |
|---|---|---|---|
| ① | Assurance | $0-50M | 0% |
| | | $50-100M | 5% |
| ② | Advantage | $100-130M | 30% |
| ③ | Transformation | $130-250M | 50% |
| | Cap | $250M+ | 0% / Cap |

Risk/Gain    1. In addition, there is potential for a qualitative performance fee overlay at NCR's sole discretion based on the quality of BCG's work (e.g., analytic and process rigor, collaboration, capability building) if BCG total fees do not reach the cap level

Untitled 8       THE BOSTON CONSULTING GROUP        **Draft—for discussion only**        2

calculating that fee.  Accordingly, the Statement of Work provided that the data source for "all

calculations" would include "NCR's Services Business' income statement," which was also the

source of the Services Business' reporting that ultimately rolled up into NCR SEC filings and

earnings releases.

59.    The Statement of Work further required NCR to furnish BCG "with

monthly income statements, balance sheets and [foreign exchange] adjustments required to make

all calculations."

60.    In recognition of the importance of ensuring that NCR and BCG had access

to the same financial information for purposes of assessing and calculating AGMI, and to ensure

accurate calculations, the Statement of Work established the GMI Review Committee, which was

to be comprised of BCG and NCR members and charged with "evaluat[ing] new realized gross margin improvements that have not yet been approved" and "[b]ased on their findings . . . approv[ing] payment in accordance with the Risk/Gain Sharing Fee percentages."  After approval by the GMI Review Committee, the amount due to BCG would be invoiced within seven days and all invoices, including invoices approved by the GMI Review Committee, "are payable within thirty (30) days of the date of NCR's receipt of invoice."

61.   With respect to the Qualitative Bonus, the Statement of Work afforded BCG a potential bonus at the discretion of the Executive Sponsor (at the time Mr. Benjamin) of the Services Business transformation based on NCR's evaluation of the quality and impact of BCG's work in areas beyond gross margin improvement such as analytic and process rigor, collaboration, capability building, optimization of working capital, impact of macro-economic or competitor headwinds.  The purpose of this bonus was to compensate BCG for additional services it furnished to NCR that provided long-term value and would not otherwise be captured in the Risk/Gain Sharing Fee.

62.   *Fourth*, the Statement of Work set forth governance covenants that BCG and NCR put in place to ensure that they "function[ed] as a true partnership with aligned goals and incentives."  For BCG in particular, given the amount of fees that it put at risk with the contingent nature of the Risk/Gain Sharing Fee, it was essential to be involved in any major decisions that could impact the viability of Mission One and that it had "a seat at the table" along with NCR's and the Services Business' leadership teams "with a hands-on ability to appropriately influence key decisions and outcomes."

63.   In this regard, the Statement of Work prescribed that "BCG representative[s] will participate in [the] Services [business] and NCR leadership meetings to ensure BCG has an end-to-end view of the business that extends beyond the 15 initiatives and 4

enablers that BCG is focusing on, which will allow [BCG] to have the ability to voice opinions in a timely manner on key decisions."

64.     Additionally, the Statement of Work established the Steering Committee, responsible for "guidance and oversight" of the Mission One program.

65.     The Steering Committee was to be composed of senior NCR and BCG leaders who were tasked with meeting "on a regular . . . and ad hoc basis to engage on program status updates, issues to flag, key decisions required, and to track the progress of the [Mission One] program and its underlying initiatives and enablers to ensure that the program is successful."

66.     The responsibilities of the Steering Committee included: (i) steering of the Mission One project; (ii) validating team hypotheses; (iii) providing expertise; (iv) resolving disputes; and (v) making key decisions.  The Statement of Work provided that in the event of a dispute between the Parties, it should first be brought to the Steering Committee, which shall "use best efforts to resolve the matter, through an open dialogue, options review and rationale."

67.     *Fifth*, the Statement of Work governed the termination of the Contract and provided remedies for BCG in the event that NCR terminated the Contract prematurely.  In recognition of BCG's significant investment in Mission One through performance of the Diagnostic, its contemplated work under the Contract, and its entitlement to a return on that investment should NCR choose to terminate the contract early, the Statement of Work provided that: "In the event NCR terminates this Contract for convenience, then NCR will compensate BCG the greater of

> A. Total of BCG's professional fees for work performed and related expenses up to the date of termination, less prior payments received by BCG.  Professional fees and related expenses will be calculated at BCG's rates for work and expenses of a similar nature, not to exceed the cumulative estimated professional fees and expenses up

to the termination date, including the applicable on-site Transformation Office monthly running costs . . .

[or]

B. Pursuant to the *Key Components of the Fee Structure* outlined above, BCG would receive the Fixed Fees plus any Risk/Gain Sharing Fees earned from Gross Margin Improvement up to 12 months following the date of termination which shall not extend beyond December 31, 2019."

C.  **Mission One is Successful, and the NCR Board is Kept Informed of BCG's Efforts and Challenges**

68.   Right out of the gate, Mission One achieved success.  In the first months following implementation of the program, the Parties instituted changes to improve NCR's competitive advantage in the marketplace and its customer experience and value.  BCG's initiatives within the Services Business included, among others, building out support for the Services sales force, creating assessment tools to maximize contract profitability, devising processes to improve NCR's machine performances, and creating tools to improve NCR's repair diagnostics.  These initiatives established a platform for long-term growth for the Services Business.

69.   Mr. Benjamin played a critical role in Mission One's early success by providing active and regular engagement and strong support for BCG's work.  Because Mission One required BCG to immerse itself in the Services Business and, as the Diagnostic showed, many of NCR's employees were still entrenched in a non-collaborative culture, BCG's efforts necessarily required the support of NCR's leadership.  Accordingly, Mr. Benjamin facilitated introductions and meetings between the BCG and NCR teams and helped resolve challenges and issues that arose.

70.     In addition to Mr. Benjamin's support, and in accordance with the Statement of Work, the Steering and GMI Review Committees also contributed to Mission One's early success.   The Committees' regular meetings in 2017 promoted open lines of communication between BCG and NCR managers to discuss and address Mission One's progress, areas for improvement, and any other issues pertaining to the program.

71.     However, NCR's culture remained resistant to change, and the impact of this dysfunctional culture on BCG's efforts was consistent and significant: BCG faced near-constant resistance and had to work much harder in light of the lack of commitment on the part of many NCR employees to Mission One.   To that end, BCG communicated these issues to NCR's board of directors (the "Board") and senior management.

72.     In December 2017, for instance, Mr. Kotzen spoke with a member of the Board and explained that the Services Business was neglected and plagued by a toxic work culture. Mr. Kotzen detailed how NCR had underinvested in financial and human capital for Services, resulting in poor services to customers and low employee morale.   Moreover, NCR's employees operated in fear of failing to hit short-term financial targets, while also fearing public embarrassment and retribution if targets were not achieved.   This environment, Mr. Kotzen explained, was an impediment to change, and Services employees told BCG that they did not believe any change would occur.

73.     Despite these challenges, Mr. Kotzen expressed confidence that BCG could revitalize the Services Business and reach the Parties' gross margin improvement objectives.   The Board member did not provide any substantive feedback to Mr. Kotzen.

74.     On February 8, 2018, Messrs. Kotzen, Gilliland, and Varma met with three members of the Board to discuss the Mission One program and the challenges confronting BCG.

The BCG team provided an overview of BCG's work, their views on NCR's strengths and areas for improvement, and then discussed ways in which BCG and NCR could align moving forward. Based on feedback at the meeting, BCG's presentation was well-received. One member of the Board expressed to Mr. Kotzen after the meeting that he was very happy with BCG's presentation and its work on Mission One.

75. On February 13, 2018, BCG conducted a call with the full Board to discuss the Mission One program. During this call, BCG reiterated the challenges facing the Services Business, and stated that its success depended on strong leadership. The Board requested more feedback on Services' leadership team, which BCG provided. The Board's reaction was mixed – some directors understood the challenges BCG faced; others reacted defensively to comments regarding management. But no director questioned the quality of the services BCG was providing or the results achieved, or otherwise called into doubt the rights and obligations of the Parties under the Contract.

76. On February 18, 2018, Mr. Benjamin presented to the NCR Board his own detailed overview of the financial performance and state of NCR's business, including an update on the Services Business and the Mission One program. As related by Mr. Benjamin to BCG afterward, Mr. Benjamin explained to the Board that Services launched Mission One to modernize the business with a highly innovative partnership and build new capabilities to ensure long term success. Examples of the new capabilities were found in, among others, areas that included revenue (e.g., standardized contract structures, new pricing tools), cost control (e.g., precision diagnostics, dashboard to monitor field performance), and corporate culture (e.g., a comprehensive change management program and a purpose program aimed at identifying NCR's distinctive strengths). Mr. Benjamin also presented the Board with a 100-day action plan that included the

next steps required for the continued transformation of the Services Business. To BCG's knowledge, no Board member questioned the success of Mission One or expressed a desire to discontinue the program.

**D.    Changes in NCR's Leadership Exacerbate Problems in the Services Business and Pose Additional Challenges for BCG**

77.    Early 2018 presented another set of challenges for BCG as NCR underwent substantial management changes.

78.    By this time, Mr. Benjamin had replaced five of the eight leadership positions on his team. One replacement was critical to the Services Business: on January 8, 2018, Mr. Benjamin terminated Rick Marquardt, the then-head of the Services Business, and promoted Mr. Ciminera to replace him.

79.    On March 19, 2018, Mr. Nuti effectively retired as CEO, although he did not formally relinquish the title until May 2018.

80.    On the same day that Mr. Nuti retired, Mr. Benjamin announced that he was leaving NCR to become the CEO of Nuance, a computer software technology corporation.

81.    On April 30, 2018, NCR hired Michael Hayford as its new CEO and, shortly thereafter, hired Owen Sullivan as its new COO.

82.    Therefore, as of April 30, 2018, NCR and NCR's Services Business was under completely new leadership with Mr. Hayford as CEO, Mr. Sullivan as COO, and Mr. Ciminera as EVP of Services. Later that year, Andre Fernandez replaced Bob Fishman as CFO.

83.    As a result of the turnover in NCR's C-Suite, no senior executive who was involved in engaging BCG in 2017 was still employed at NCR by the second quarter of 2018. BCG later learned that around this time, NCR's new leadership team considered terminating what it apparently viewed as their predecessors' Contract, notwithstanding the benefits already

delivered by the Mission One program, benefits that NCR communicated to regulators and the market.  Unbeknownst to BCG at the time, in June 2018, NCR's Board and new management discussed at a Board meeting terminating the Contract and considered a presentation from Mr. Ciminera on the financial impact of the Contract's termination fee.  On information and belief, the Board determined not to terminate the Contract in part because it did not want to trigger the termination fee that would be due if NCR chose to terminate BCG "for convenience."  Rather than terminating, NCR apparently devised a different plan that would permit it to continue reaping the benefits of BCG's full performance without having to pay the contractually agreed-upon fee: NCR simply would not pay the Risk/Gain Sharing Fee but would not disclose that plan until BCG had largely completed performance.  This way, NCR could have its cake and eat it too, allowing it to secure BCG's full performance under the Statement of Work without paying for it.

E.   **NCR Engages BCG to Work on the ABO Project**

84.   In the midst of the turmoil within NCR's leadership team, BCG continued its work on Mission One, and NCR expanded BCG's mandate.  In January 2018, NCR launched its People 2020 Program ("People 2020"), which was established to analyze staffing across NCR's various businesses to determine the best structure, allocation and dedication of resources that maximized value and efficiency.  Originally launched under the sponsorship of Mr. Nuti, Mr. Benjamin and Ms. Ledford, BCG was brought in to conduct an initial diagnostic and then, in a second phase, BCG was asked to help NCR implement a specific component of People 2020, the Activity Based Organization ("ABO") Project, which was designed to eliminate low value work.  ABO was to be implemented in four phases—(i) Phase 1, an initial, diagnostic phase; (ii) Phase 1B, an interim bridge period; (iii) Phase 2A, the ABO survey and analysis phases; and (iv) Phase 2B, organization and structured planning.  The Parties' agreement concerning the ABO Project is

memorialized in a Project Confirmation Letter executed on April 30, 2019 (the "ABO Agreement"
attached as Exhibits B and C) and provided that BCG was to be paid approximately $3.5 million
for its services.

85.     Between February and March 2018, BCG implemented the first phase – a
diagnostic phase – for the ABO Project.  BCG reviewed all internal and external labor spending
and created a comprehensive reorganization plan, accruing approximately $1.4 million in
professional fees and related expenses.  At the end of this first phase, BCG sent an invoice to NCR
for the $1.4 million fees, which NCR paid.

86.     In April 2018, BCG was scheduled to commence Phase 2 of the ABO
Project.  Given that the timing of Phase 2 coincided with the significant turnover in NCR senior
leadership, BCG sought Ms. Ledford's authorization to begin work and assurance that NCR would
pay for BCG's services.  Ms. Ledford provided both.  Accordingly, BCG continued its work on
the ABO Project, including (i) launching and completing an ABO survey sent to all NCR
managers; (ii) analyzing survey data; (iii) conducting dozens of interviews; and (iv) identifying
high potential improvement areas and communicating these areas of improvement to NCR
executives and managers over dozens of meetings.  Throughout BCG's work on the ABO Project,
NCR personnel, including Ms. Ledford, expressed internally at NCR and to BCG their satisfaction
with BCG's performance.

87.     On May 16, 2018, Ms. Ledford abruptly instructed BCG to cease work on
the ABO Project.  Two days later, BCG did so and transitioned the ABO Project to NCR through
a series of hand-off sessions and meetings at no cost to NCR.  BCG repeatedly requested an
explanation for why the ABO Project was prematurely terminated, but NCR refused to give any
explanation.  BCG sent NCR an invoice, dated July 13, 2018, for $1.47 million due for the services
BCG had performed on Phase 2.  That invoice has not been paid.

F.    **NCR Abandons Any Pretense of Fulfilling its Governance Obligations under the Statement of Work**

88.    Despite BCG's consistent efforts to establish a relationship with NCR's new leadership, including requesting a meeting as early as May 2018, BCG was not granted an audience until September 2018.  NCR told BCG, for instance, that Mr. Hayford had "bigger issues" and was not focused on Services because it was the only division performing consistent with NCR's business plan (ironically due, of course, to BCG's efforts).  Mr. Hayford delayed meeting with BCG for over four months.

89.    In addition, following Mr. Benjamin's departure, the Steering Committee and GMI Review Committee stopped meeting because of NCR.  Therefore, there was no formal mechanism for BCG to communicate or address issues it was confronting with respect to the implementation of Mission One efforts.

90.    On September 25, 2018, Mr. Kotzen and Dr. Gilliland finally met with Messrs. Hayford, Sullivan, and Ciminera to discuss Mission One's progress, particularly during the four month period following Mr. Benjamin's departure.

91.    At the meeting, Mr. Kotzen and Dr. Gilliland highlighted the various areas in which NCR was failing to comply with the Statement of Work and the resulting threat to achieving the Parties' $250 million improvement goal by the end of Q4 2019.  For example, BCG challenged NCR's decision to shift its public reporting from business line (Services, hardware, and software) to industry line (banking, hospitality, retail) reporting.  BCG explained that this shift would take focus away from Services, which in turn would threaten the success of Mission One.  BCG also observed that NCR was failing to comply with the requirement that a "meaningful percentage (50%+) of Services' executives' bonuses are linked to Gross Margin Improvement."  Rather, NCR applied (as it had in the past) an "all-or-nothing" approach to executive

compensation—paying or withholding the Services Business executives' bonuses depending on whether NCR-wide threshold performance metrics were met, regardless of the strong performance of Services.

92.     BCG also requested that NCR reconstitute the Steering and GMI Review Committees, which had stopped meeting as of Spring 2018, after the majority of NCR's committee members ceased working for NCR.  BCG made repeated requests that NCR appoint employees who would participate on these Committees.  For example, BCG proposed that Mr. Ciminera, KM Suresh (the recently appointed CFO of Services), Mr. Sullivan, and Mr. Fernandez serve on the GMI Review Committee.  NCR declined this suggestion.  Additionally, through Mr. Ciminera, BCG made numerous attempts to meet with Mr. Sullivan and Mr. Hayford, attempts that went unanswered or rebuffed by NCR.

93.     NCR's failures to engage with BCG had a real impact on Mission One's progress.  BCG made numerous recommendations to improve Services that NCR never fully implemented, and BCG had no mechanism to discuss or work through the challenges being presented on a day-to-day basis.

94.     On December 5, 2018, Mr. Kotzen, Dr. Gilliland, and Joseph Davis (BCG Chairman of North America, Senior Partner, and Managing Director) met with Mr. Fernandez to discuss again reconstituting the Steering Committee.  The Parties agreed to meet again before Christmas, but that meeting never occurred because NCR refused to show up.

95.     Mr. Davis sent an email on December 21, 2018 to NCR expressing concerns about NCR's 2019 financial targets.  NCR had decreased the Services Business' targets from $250 million AGMI to $168 million AGMI, which, as Mr. Davis explained, violated a provision in the Statement of Work explicitly stating that the Parties would work cooperatively to attain the $250 million AGMI goal, a goal that NCR recently had affirmed to BCG during the September 25, 2018

meeting.  Mr. Davis also explained that the fee structure, by design, required BCG to provide the majority of its services upfront, with the upside only becoming attainable on the back end of the Mission One program.  Accordingly, NCR's failures to comply with the Statement of Work at this stage of the Contract posed a real threat to BCG's financial investment.  NCR did not respond to this email.

96.     Mr. Davis followed up in early January 2019 to confirm a January 16 meeting.  Mr. Davis emphasized the importance of the meeting and said that BCG would be flexible about the date.  The Parties agreed to meet on January 28, 2019.  One day before the meeting, NCR cancelled without providing a reason.  NCR further advised BCG that Mr. Sullivan was not available again until March, and Mr. Fernandez and Mr. Ciminera had limited availability in February.  The Parties rescheduled the meeting for March 20, 2019, more than two months after the originally scheduled meeting.  On the morning of March 19, 2019, Mr. Sullivan and Mr. Fernandez again canceled the meeting without providing any explanation.

97.     At the same time, other BCG employees had scheduled a meeting for January 18, 2019 with Mr. Suresh and Mr. Ciminera to discuss the calculation of AGMI for Q4 2018 since NCR still had not appointed new members to the GMI Review Committee.  The day of the meeting, Mr. Ciminera, without explanation, declined the calendar invite that he previously accepted for the meeting, and never appeared.  That same day, Mr. Suresh notified BCG that Mr. Fernandez would not participate on the GMI Review Committee.

98.     As BCG attempted to meet with NCR's senior management teams, it continued to perform and meet all of its obligations under the Statement of Work.  Indeed, since BCG began its work at NCR, NCR has never complained to BCG about BCG's performance or services.

G.    **NCR Refuses to Pay for Amounts Invoiced by BCG**

99.    NCR has not made any Risk/Gain Sharing Fee payments for the services provided in Q2, Q3, or Q4 2018, or any quarter of 2019, under the Contract.  BCG and NCR initially agreed on Risk/Gain Sharing Fees in the amount of $2.1 million for Q2 and Q3 2018, subject to later discussion of how to treat certain costs for purposes of the AGMI calculation, an issue the Parties did not agree on at the time.  NCR submitted a purchase order request for the two quarters on November 29, 2018.  BCG sent its invoice on December 8, 2018 ("December 2018 Invoice").  Though NCR initially agreed to pay the $2.1 million due, the December 2018 Invoice remains outstanding.

100.    On March 4, 2019, BCG and NCR agreed to an invoice amount of $5.4 million for Q4 2018, again subject to later discussion of how to treat certain items for purposes of AGMI.  BCG submitted an invoice to NCR on April 13, 2019 ("April 2019 Invoice"),  which remains outstanding.

101.    On May 8, 2019, BCG and NCR agreed to an invoice amount of $4.339 million, again deferring certain one-time adjustments for review by the GMI Review Committee.  BCG submitted an invoice on May 25, 2019 ("May 2019 Invoice"), which remains outstanding.

102.    On September 3, 2019, BCG sent NCR its invoice for Q2 2019 totaling $7,333,277 ("September 2019 Invoice").  The Parties have not reached agreement on this amount given that NCR has failed both to provide the financial information to which BCG is entitled under the Contract and to meet with BCG to discuss this invoice.  The September 2019 Invoice remains outstanding.

103.    Consequently, NCR has thus far failed to pay the December 2018 Invoice, the April 2019 Invoice, the May 2019 Invoice, and the September 2019 Invoice, which together total more than $19.172 million (and which remains subject to the adjustments noted above), in

connection with BCG's work.  Including the work performed for the ABO Project, the total amount invoiced and owed is $20.642 million, plus interest.

**H.**    **NCR Refuses to Provide BCG with Financial Information That NCR Is Required to Provide under the Contract**

104.    In addition to disregarding its contractual payment and governance obligations, NCR's recent outright refusal to provide any financial information to BCG notwithstanding its obligations under the Contract to do so raises concerns regarding the integrity of the financial information NCR has provided to BCG under the Contract.

105.    The Contract provides that BCG is entitled to receive the Services Business' "monthly income statements, balance sheets, and FX adjustments required to make all calculations" necessary under the Statement of Work.  On or around July 14, 2019, a member of the BCG team requested the Services Business' income statement for Q2 2019 in order to calculate the Risk/Gain Sharing Fee for that quarter.  NCR refused to provide this information, responding, falsely, that NCR would not be providing any information because Mr. Ciminera was in discussions with BCG partners regarding the "fee structure" of Mission One.  On August 6, 2019, the BCG team member requested data concerning NCR's capital expenditures for Q2 2019, in order to calculate the Risk/Gain Sharing Fee.  Yet again, NCR refused to provide this information.

106.    NCR's refusal to furnish BCG with this information not only violates the clear terms of the Contract but raises serious questions as to NCR's motivations in hiding this data from BCG.

107.    In particular, beginning in or around 2013, NCR attempted to convince investors that it was transforming from a hardware to a software company.  NCR made significant acquisitions to fuel this supposed transformation and incurred substantial debt in the process, which strained both the company's resources and financial results.  Concurrently, NCR's core

hardware business faced pressure from digital and alternative payment platforms, further constraining its ability to service its debt and make further investments.  Indeed, in March 2019, Standard & Poor's and Moody's Investors Service downgraded to below investment grade its ratings for NCR's senior unsecured notes to reflect a decline in NCR's operating performance and credit metrics and their concern for the company's ability to reduce debt leverage from current levels.

108.    Given NCR's financial situation coupled with its refusal to provide BCG with contractually required information, there is reason to believe that NCR has resorted to manipulating its reported financial results, which constitute the basis for calculating AGMI and the Risk/Gain Sharing Fee, at least in part in order to reduce BCG's fees.

**I.   Even As It Does Not Pay Amounts Owed, NCR Publicly Proclaims Mission One's Success**

109.    As NCR disregarded its payment obligations, it continued to broadcast Mission One's success externally to investors over a two-year period.  NCR's public statements are significant: they are admissions that NCR has reaped the financial and operational benefits of BCG's efforts over a more than two-and-a half year period and a testament to the success of those efforts and accordingly, BCG's right to be paid substantial Risk/Gain Sharing Fees under the Contract.  These statements also wholly undermine any position by NCR that BCG is not entitled to its Risk/Gain Sharing Fees.

110.    On a Q4 2017 earnings call on February 8, 2018, for instance, Mr. Benjamin and Mr. Fishman, Executive Vice President, Chief Accounting Officer, and CFO, stated:

> Service margins were up 280 basis points in the quarter and finished up 310 basis points for the full year.  We have talked often over the past year about our business improvement initiatives, particularly in terms of the efficiency and productivity gains we believe we can capture in our Services segment.  Q4 [2017] showed a continuation

of that trend, and we see a growing number of opportunities moving forward to accelerate our Mission One or M1 Services transformation.

****

Services gross margin rate continues to expand due to sustainable profit improvements achieved through our [Mission One] initiative. [Mission One] is centered on modernizing our Services business in terms of how we face and service our customer base and identifying the areas where we can improve our structural efficiency. We are also focused on driving higher managed services, which helps achieve stronger margins . . . The Services segment significantly expanded their margins by 310 basis points in 2017, led by sustainable improvements achieved through [Mission One].

111.   In earnings calls in May and July 2018, Mr. Hayford and Mr. Fishman boasted to investors that:

Services gross margin rate continues to expand due to sustainable profit improvements achieved through our [Mission One] initiative. [Mission One] is centered on modernizing our service business in terms of how we face and service our customer base and identifying the areas where we can improve our structural efficiency[;]

****

Our previously announced restructuring and transformation initiatives continue to progress on track. In Services, our Mission One performance and profit improvement program continues to deliver revenue growth and margin enhancement[; and]

****

Gross margin continues to expand, based on our Mission One initiative to improve productivity and efficiency.

NCR also touted Mission One's success in its public filings with the SEC in June and September 2018:

We continue to evaluate and implement programs to prioritize driving margin improvement. In Services, our Mission One performance and profit improvement program is focused on transforming NCR's service margin profile through i) productivity

and efficiency improvements; ii) remote diagnostics and repair; iii) product life cycle management; and iv) a higher mix of managed services.

**\*\*\*\***

In Services, our Mission One performance and profit improvement program continues to deliver revenue growth and margin expansion.

112.    During a Q3 2018 earnings call on October 30, 2018, Mr. Hayford noted:

[T]he consistent implementation of our [Mission One] initiative is driving further margin expansion in Services as gross margin reached 26.8% in the quarter, up 70 basis points compared to last year.  Improving our margin profile in Services will remain a key priority.

**\*\*\*\***

So the way you should look at it is there is 3 distinct efficiency streams going on, the Services, [Mission One] that we've announced in the past continue to execute.  And you can see the benefits for the [Mission One] initiative in the Services numbers each quarter.  And we're continuing to make progress, continuing to get margin expansion.   And more importantly, our customer sat[isfaction] numbers are continuing to improve in that area.

113.    During a Q4 2018 earnings call, Mr. Hayford again commented that "We're very focused on service . . . [s]o in addition to improving the margin, we did a number of things on the service platform to improve our delivery to our customers and to focus not just on meeting our contract commitments, but focus on winning against our competitors."  On the same call, Mr. Fernandez stated that "Services margins continued to expand as a result of our Mission One transformation initiatives, which have improved productivity and efficiency."

114.    In NCR's Form 10-Q for the quarter ended September 30, 2018, NCR stated that "Operating income increased in the three and nine months ended September 30, 2018 compared to the three and nine months ended September 30, 2017 primarily due to higher revenue and sustainable improvements achieved through our Mission One (M1) initiative."

115.    During NCR's Investor Day presentation on November 7, 2018, NCR highlighted Mission One and its focus on Services performance "[d]riving revenue and [gross margin] expansion."  Indeed, in what NCR deemed a "Services Success" and "Manufacturing & Supply Chain Transformation," NCR observed how Mission One initiatives drove revenue growth by 6%, margin expansion by more than 400 basis points, and customer satisfaction by more than 1,080 basis points.

116.    As evidenced by NCR's statements to its investors, Mission One was a resounding success.  As a result of Mission One, the Services Business became the "star" of NCR's portfolio.  Mission One's achievements were reflected in the Services Business' adjusted gross margin improvements, which based on BCG's projections will total more than $200 million dollars through the end of Q4 2019.  Since its launch, Mission One has steadily delivered improvements in adjusted gross margin each quarter.  Below is a chart detailing the AGMI for Services since Mission One commenced.

| FINANCIAL QUARTER | AGMI (in millions) |
| --- | --- |
| Q2 2017 | $64.2 |
| Q3 2017 | $84.3 |
| Q4 2017 | $104.1 |
| Q1 2018 | $114.7 |
| Q2 2018 | $122.3 |
| Q3 2018 | $132.3 |
| Q4 2018 | $145.3 |
| Q1 2019 | $162.6 |
| Q2 2019 | $184.1 |
| Q3 2019 (plan) | $197.3 |
| Q4 2019 (plan) | $214 |

117.     Based on these results, and assuming the data provided by NCR to BCG is correct, NCR's total contractual obligation to BCG exceeds $80 million, depending on the performance of Mission One through the remainder of 2019.

**J.     BCG's Attempts to Resolve the Dispute**

118.     BCG made concerted efforts to engage with NCR on its non-payment under the Contract, but was repeatedly strung along with representations that payments were forthcoming without payment ever being made.  In that way, NCR perpetuated its apparent goal of securing BCG's full performance under the Contract without paying the amounts it owes thereunder.

119.     On April 23, 2019, Mr. Davis met with Mr. Sullivan to discuss NCR's nonpayment.  Mr. Sullivan was complimentary of BCG's performance in connection with Mission One, but indicated that NCR was frustrated with the Statement of Work's payment structure, a comment that Mr. Sullivan never explained.

120.     On June 6, 2019, Dr. Gilliland met with Mr. Ciminera to discuss NCR's nonpayment.  Mr. Ciminera said he was embarrassed that BCG had not been paid.  He said he was authorized to approve payment for the December 2018 and April 2019 Invoices, and received approval to pay the May 2019 Invoice in July.  Despite Mr. Ciminera's promises, no payment followed.

121.     On June 11, 2019, BCG reached out to Mr. Ciminera again regarding the overdue invoices owed.  Mr. Ciminera stated that he was "looking into why these have not been paid."

122.     A few days later, on June 17, 2019, Mr. Davis and Dr. Gilliland attended a purported "Steering Committee meeting" with Mr. Ciminera.  During that meeting, Mr. Ciminera

informed Mr. Davis and Dr. Gilliland that Mr. Fernandez, the CFO, authorized payment of the overdue invoices.  Despite NCR's assurances, no payment followed.

123.    On July 11, 2019 Mr. Ciminera again met with Dr. Gilliland and claimed that he was empowered to make a decision about whether the Risk/Gain Sharing Fee could be paid, suggesting that payment would be forthcoming.

124.    But NCR reversed course during a July 15, 2019 call between NCR's and BCG's finance departments, with NCR informing BCG that NCR would not be providing any financials to calculate the Risk/Gain Sharing Fees for Q2 2019 because NCR unilaterally decided to create a new, aggregate fixed fee structure in place of the Risk/Gain Sharing Fee.  Dr. Gilliland met with Mr. Ciminera on July 17, 2019 to discuss NCR's attempt to unilaterally rewrite the Statement of Work, but Mr. Ciminera claimed that he did not yet have the final numbers to calculate the amounts owed.

125.    The next day, BCG's finance department checked the NCR payment portal where NCR lists all outstanding and paid invoices from BCG.  Up to this point, the portal reflected that BCG's invoices had been approved for payment.  Now, the portal showed that NCR cancelled all three overdue invoices for work performed in connection with the Mission One program.  Upon information and belief, NCR cancelled these invoices in order to unfairly and improperly gain leverage over BCG to renegotiate the outstanding Risk/Gain Sharing Fees owed to BCG.

126.    On July 17, 2019, Dr. Gilliland and Mr. Ciminera met to discuss the work BCG had performed as part of the Mission One program.  Mr. Ciminera commented that Mission One had produced value for the Services Business and that he believed that the program would continue to produce value in the future.

127.    On July 23, 2019, Dr. Gilliland and Mr. Ciminera discussed the Statement of Work.  Mr. Ciminera claimed that he recently discovered that he was not authorized to resolve

the fee dispute, only Mr. Hayford and Mr. Bedore were.  Mr. Ciminera said that Mr. Hayford was upset about the terms of the Statement of Work that his predecessor agreed to and executed. According to Mr. Ciminera, Mr. Hayford now believes that Mr. Benjamin and Mr. Nuti had negotiated an unfavorable Contract for NCR by agreeing to the Risk/Gain Sharing Fee structure and NCR was unwilling to make payment under the Contract.

128.    In October 2019, Mr. Davis, Dr. Gilliland and a senior BCG in-house counsel flew to Atlanta to meet with senior NCR executives, including Mr. Sullivan , Mr. Ciminera and Mr. Bedore, in an attempt to resolve this dispute.  Despite that meeting, as well as numerous follow-up teleconferences in the past two months, the Parties have been unable to resolve the dispute.

### COUNT ONE
### (Breach of Contract – Breach of Statement of Work)

129.    BCG repeats and re-alleges each and every allegation in paragraphs 1-128 above as if fully set forth herein.

130.    At all relevant times, the Statement of Work was and is a valid, binding and enforceable contract.

131.    The Statement of Work required NCR, among other things, to:

   a.   operate as a partner to BCG;

   b.   provide BCG a "seat at the table" with NCR's and Services' Leadership Teams;

   c.   allow BCG to participate in Services and NCR senior leadership meetings to ensure BCG has an end-to-end view of the business;

   d.   participate in the Services Transformation Steering Committee;

e.   make best efforts to maximize the gross margin growth of the Services Business.

f.   ensure that a meaningful percentage (50%+) of Service executives' bonuses are linked to Gross Margin Improvement or Controllable Operating Income and to the success of the Services Transformation Program;

g.   calculate the Gross Margin Improvement at the end of each quarter;

h.   provide BCG monthly income statements, balance sheets, and FX adjustments required to make all calculations;

i.   participate in the Gross Margin Improvement Review Committee;

j.   pay all fees owed to BCG on a timely basis and in amounts calculated in accordance with the fee structure in the Statement of Work; and

k.   pay all invoices within thirty days of the date of receipt of invoice.

132.   For the reasons stated above, NCR has materially breached these and other terms of the Statement of Work.

133.   At all times, BCG performed its obligations under the Statement of Work.

134.   BCG has suffered damages as a result of NCR's conduct as described herein.

135.   Accordingly, NCR is liable to BCG for compensatory damages in an amount to be determined at trial.

## COUNT TWO
### (Breach of Contract – Breach of ABO Agreement)

136.   BCG repeats and realleges each and every allegation in paragraphs 1-135 above as if fully set forth herein.

137.    At all relevant times, the ABO Agreement was a valid, binding and enforceable contract.

138.    The ABO Agreement provided that BCG is entitled to $3.5 million net fees for the ABO Project.

139.    Between April 16, 2018 and May 18, 2018, BCG performed various services for NCR under the ABO Agreement.

140.    On May 16, 2018, NCR directed BCG to cease performing additional work.

141.    On December 8, 2018, BCG requested $1.47 million in fees owed for the work performed on the ABO Project under the ABO Agreement.  NCR has materially breached the ABO Agreement by failing to pay BCG this amount, which BCG earned for work performed and is due and owing under the ABO Agreement.

142.    At all times, BCG performed its obligations under the ABO Agreement.

143.    Plaintiff has suffered damages as a result of NCR's conduct as described herein.

144.    Accordingly, NCR is liable to BCG for compensatory damages in an amount to be determined at trial.

**COUNT THREE**
**(Unjust Enrichment)**

145.    BCG repeats and realleges each and every allegation in paragraphs 1-144 above as if fully set forth herein.

146.    NCR received and retained a benefit conferred by BCG at BCG's expense by withholding payment due for work performed on Mission One and the ABO Project.

147.    NCR has benefited unjustly at BCG's expense by retaining the benefits of BCG's work under the Contract and the ABO Agreement.  In equity and good consciousness, NCR

should not be permitted to retain these benefits of BCG's work under the Contract and the ABO

Agreement without compensating BCG for the reasonable value of the benefits conferred on NCR.

148.    BCG has been harmed as a result of NCR's conduct as described herein.

149.    Accordingly, BCG is entitled to restitution from NCR and for the

disgorgement of all of NCR's profits, benefits, and other compensation obtained by NCR through

its wrongful conduct.

<u>**COUNT FOUR**</u>
<u>**(Accounting)**</u>

150.    BCG repeats and realleges each and every allegation in paragraphs 1-149

above as if fully set forth herein.

151.    At all relevant times, the Statement of Work was and is a valid, binding and

enforceable contract.

152.    Under the Statement of Work, BCG is entitled to a Risk/Gain Sharing Fee,

the amount of which is dependent on AGMI in the Services Business.

153.    The calculation of the Risk/Gain Sharing Fee necessarily depends on

financial documents and information prepared by and in the exclusive possession of NCR.

154.    Upon information and belief, NCR is improperly manipulating the financial

information previously provided to BCG, and withholding financial information to which BCG is

entitled under the Contract, to avoid paying the Risk/Gain Sharing Fee.

155.    BCG does not have access to the financial documents and information

necessary to accurately calculate the Risk/Gain Sharing Fee.

156.    BCG, therefore, is entitled to and requests an accounting of NCR's financial

performance and results for the relevant period.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for an Order and Judgment:

157.    Awarding Plaintiff compensatory damages in amounts to be determined at trial;

158.    Awarding Plaintiff pre-judgment and post-judgment interest;

159.    Ordering restitution and disgorgement to BCG in the amounts by which NCR has been unjustly enriched from BCG's performance under the Contract;

160.    Directing that NCR account to BCG for its financial performance and results from January 1, 2017 to date;

161.    Awarding Plaintiff its reasonable costs and expenses incurred in this action; and

162.    Awarding Plaintiff such other and further relief as the Court deems just and proper.

Dated:    November 1, 2019
          New York, New York

                                            Respectfully submitted,

                                            CADWALADER, WICKERSHAM & TAFT LLP

                                            By:  /s/ Jason Halper

                                                 Jason M. Halper
                                                 Todd Blanche
                                                 Jared Stanisci

                                                 200 Liberty Street
                                                 New York, NY 10281
                                                 Tel.:  (212) 504-6000
                                                 Fax:  (212) 504-6666
                                                 jason.halper@cwt.com
                                                 todd.blanche@cwt.com
                                                 jared.stanisci@cwt.com

                                                 *Attorneys for Plaintiff*