UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| THE BOSTON CONSULTING GROUP, INC., <br><br> Plaintiff, <br><br> vs. <br><br> NCR CORPORATION, <br><br> Defendant. | **DEFENDANT'S ANSWER AND COUNTERCLAIMS** <br><br> **JURY TRIAL DEMANDED** <br><br> 1:19-cv-10156-LGS |

## ANSWER

Defendant NCR Corporation ("NCR" or "Defendant") respectfully submits this answer in response to the Corrected Complaint of The Boston Consulting Group, Inc. ("BCG" or "Plaintiff"), dated November 1, 2019, and, by its undersigned attorneys, states as follows:

## NATURE OF THE ACTION

1.       Defendant denies the allegations in the first sentence of paragraph 1, except admits that BCG provided Mark Benjamin, then the Chief Operating Officer ("COO") of NCR, with the Statement of Work appended as Exhibit A to the Complaint (the "Statement of Work"), dated June 22, 2017, and refers to that document for its contents.  Defendant denies the allegations in the second and third sentences of paragraph 1.

2.       Defendant denies the allegations in paragraph 2.

3.       Defendant denies the allegations in paragraph 3, except admits that Defendant filed a Form 10-Q for the quarter ending June 30, 2018, and refers to that filing for its contents.

4.       Defendant denies the allegations in paragraph 4, except admits that Defendant filed a Form 8-K on July 26, 2018, and refers to that filing for its contents.

5.      Defendant denies the allegations in paragraph 5, except admits that an NCR Q3 2018 earnings call took place on October 30, 2018, and refers to the transcript of that call for its contents.

6.      Defendant denies the allegations in the first sentence of paragraph 6, except admits that NCR makes statements to investors from time to time and refers to those statements for their contents.  Defendant states that the allegations in the second, third and fourth sentences of paragraph 6 state an argument to which no response is required.  To the extent a response is required, Defendant denies those allegations.

7.      Defendant denies the allegations in paragraph 7, except admits the existence of the Statement of Work, and refers to that document for its contents.

8.      Defendant denies the allegations in paragraph 8.

9.      The allegations in paragraph 9 state an argument to which no response is required. To the extent a response is required, Defendant denies the allegations in paragraph 9.

10.     Defendant states it is without knowledge or information sufficient to form a belief as to the truth of the allegations in the first and second sentences of paragraph 10 and on that basis denies the allegations.  Defendant denies the allegations in the third sentence of paragraph 10.

11.     Defendant denies the allegations in paragraph 11, except admits that NCR was founded in 1884 and is best known for its ATMs, point of sale (POS) terminals, software and services.  Defendant further states that prior to January 1, 2019, NCR operated three main solutions-based business segments:  Hardware, Software and Services and after having reorganized the business, NCR currently operates four industry-based business segments: Banking, Retail, Hospitality and Other.

12.     Defendant denies the allegations in paragraph 12, except admits that Mr. Benjamin was hired as COO of NCR in Fall 2016 and states it is without knowledge or information sufficient to form a belief as to the particulars of the allegation concerning Mr. Benjamin's prior role at Automatic Data Processing ("ADP").

13.     Defendant denies the allegations in the first sentence of paragraph 13, except admits that Jeff Kotzen is a Senior Partner at BCG.  Defendant states it is without knowledge or information sufficient to form a belief as to the truth of the allegations in the second sentence of paragraph 13 and on that basis denies the allegations.

14.     Defendant states that it is without knowledge or information sufficient to form a belief as to the truth of the allegations in the first sentence of paragraph 14 and on that basis denies the allegations, except admits that in early 2017, BCG conducted some interviews with people in the Services Business.  Defendant denies the allegations in the second sentence of paragraph 14.

15.     Defendant denies the allegations in paragraph 15, except admits the existence of the Statement of Work, and refers to that document for its contents.

16.     Defendant denies the allegations in paragraph 16, except admits the existence of the Statement of Work, and refers to that document for its contents.

17.     Defendant states it is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 17 and on that basis denies the allegations, except admits the existence of the Statement of Work, and refers to that document for its contents.

18.     Defendant denies the allegations in paragraph 18, except admits the existence of the Statement of Work, and refers to that document for its contents.

19.     Defendant denies the allegations in paragraph 19.

20.     Defendant denies the allegations in paragraph 20, except admits the existence of the Statement of Work, and refers to that document for its contents.

21.     Defendant denies the allegations in paragraph 21, except admits the existence of the Statement of Work, and refers to that document for its contents.

22.     Defendant denies the allegations in paragraph 22, except admits the existence of the Statement of Work, and refers to that document for its contents, and admits that NCR announced Mr. Benjamin's departure and Mr. Nuti's retirement in its March 22, 2018 Form 8-K, and refers to that document for its contents.

23.     Defendants denies the allegations in the first and third sentences of paragraph 23. Defendant states it is without knowledge or information sufficient to form a belief as to the truth of the allegations in the second sentence of paragraph 23 and on that basis denies the allegations.

24.     Defendant denies the allegations in paragraph 24, except admits the existence of the Statement of Work, and refers to that document for its contents.

25.     Defendant denies the allegations in paragraph 25, except admits the existence of the Statement of Work, and refers to that document for its contents.

26.     Defendant denies the allegations of the first sentence in paragraph 26, except admits the existence of the Statement of Work, and refers to that document for its contents. Defendant denies the remaining allegations in paragraph 26, except admits that BCG submitted invoices to NCR.

27.     Defendant denies the allegations in paragraph 27, except admits that James Bedore, NCR's General Counsel, sent an email with an attachment to BCG on August 19, 2019, and refers to those documents for their contents.

28.     Defendant denies the allegations in paragraph 28.

## THE PARTIES

29.     Defendant states it is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 29 and on that basis denies the allegations.

30.     Defendant states it is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 30 and on that basis denies the allegations.

31.     Defendant admits the allegations in paragraph 31.

## JURISDICTION AND VENUE

32.     The allegations in paragraph 32 state a legal conclusion to which no response is required.

33.     The allegations in paragraph 33 state a legal conclusion to which no response is required.

## STATEMENT OF FACTS

34.     Defendant denies the allegations in paragraph 34, except admits that in October 2016, Mr. Benjamin became COO of NCR.

35.     Defendant denies the allegations in paragraph 35, except admits that members of BCG and NCR had meetings to discuss BCG's proposal for the Services Business.

36.     Defendant denies the allegations in paragraph 36.

37.     Defendant denies the allegations in paragraph 37, except admits that BCG conducted some review of the Services Business in or around February 2017 and did not charge its usual rates for that review.

38.     Defendant denies the allegations in paragraph 38.

39.     Defendant denies the allegations in paragraph 39.

40.     Defendant denies the allegations in paragraph 40, except admits that BCG represented to NCR that the initiatives in the Statement of Work would transform the Services Business and achieve significant gross margin improvement by Q4 2019.

41.     Defendant denies the allegations in paragraph 41.

42.     Defendant states it is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 42 and on that basis denies the allegations.

43.     Defendant denies the allegations in the first, second, fourth, fifth and sixth sentences of paragraph 43, except admits the existence of a Statement of Work, and refers to that document for its contents.  Defendant denies the third sentence of paragraph 43, except admits that the fee structure was negotiated by Mr. Benjamin.

44.     The allegations in paragraph 44 state a legal conclusion to which no response is required.  To the extent a response is required, Defendant denies the allegations in paragraph 44, except admits the existence of the Statement of Work, and refers to that document for its contents.

45.     The allegations in paragraph 45 state a legal conclusion to which no response is required.  To the extent a response is required, Defendant denies the allegations in paragraph 45, except admits that BCG reached an agreement with Mr. Benjamin in or around April 2017.

46.     Defendant denies the allegations in paragraph 46, except admits that Mission One was launched around May 2017.

47.     Defendant denies the allegations in paragraph 47, except admits the existence of the Statement of Work, and refers to that document for its contents.

48.     Defendant denies the allegations in paragraph 48, except admits the existence of the Statement of Work, and refers to that document for its contents.

49.     Defendant denies the allegations in paragraph 49, except admits the existence of the Statement of Work, and refers to that document for its contents.

50.     Defendant denies the allegations in paragraph 50, except admits the existence of the Statement of Work, and refers to that document for its contents.

51.     Defendant denies the allegations in paragraph 51, except admits the existence of the Statement of Work, and refers to that document for its contents.

52.     Defendant denies the allegations in paragraph 52, except admits the existence of the Statement of Work, and refers to that document for its contents.

53.     Defendant denies the allegations in paragraph 53, except admits the existence of the Statement of Work, and refers to that document for its contents.

54.     Defendant denies the allegations in paragraph 54, except admits the existence of the Statement of Work, and refers to that document for its contents.

55.     Defendant admits the allegations in paragraph 55.

56.     Defendant denies the allegations in paragraph 56, except admits the existence of the Statement of Work, and refers to that document for its contents.

57.     Defendant denies the allegations in paragraph 57, except admits the existence of the Statement of Work, and refers to that document for its contents.

58.     Defendant denies the allegations in paragraph 58, except admits the existence of the Statement of Work, and refers to that document for its contents.

59.     Defendant denies the allegations in paragraph 59, except admits the existence of the Statement of Work, and refers to that document for its contents.

60.     Defendant denies the allegations in paragraph 60, except admits the existence of the Statement of Work, and refers to that document for its contents.

61.     Defendant denies the allegations in paragraph 61, except admits the existence of the Statement of Work, and refers to that document for its contents.

62.     Defendant denies the allegations in the first sentence of paragraph 62, except admits the existence of the Statement of Work and refers to that document for its contents. Defendant states it is without knowledge or information sufficient to form a belief as to the truth of the allegations in the second sentence of paragraph 62 and on that basis denies the allegations, except admits the existence of the Statement of Work, and refers to that document for its contents.

63.     Defendant denies the allegations in paragraph 63, except admits the existence of the Statement of Work, and refers to that document for its contents.

64.     Defendant denies the allegations in paragraph 64, except admits the existence of the Statement of Work, and refers to that document for its contents.

65.     Defendant denies the allegations in paragraph 65, except admits the existence of the Statement of Work, and refers to that document for its contents.

66.     Defendant denies the allegations in paragraph 66, except admits the existence of the Statement of Work, and refers to that document for its contents.

67.     Defendant denies the allegations in paragraph 67, except admits the existence of the Statement of Work, and refers to that document for its contents.

68.     Defendant denies the allegations in paragraph 68, except admits that NCR made certain statements detailing the performance of the Services Business from time to time, including with respect to Mission One, and refers to those public statements for their contents.

69.     Defendant denies the allegations in paragraph 69, except admits that Mr. Benjamin introduced BCG to NCR.

70.     Defendant denies the allegations in paragraph 70.

71.     Defendant denies the allegations in paragraph 71, except admits that representatives of BCG had communications with members of NCR's Board of Directors in early 2018.

72.     Defendant denies the allegations in paragraph 72, except admits there were conversations between Mr. Kotzen and certain members of NCR's Board of Directors in or around late 2017 and early 2018.

73.     Defendant denies the allegations in paragraph 73, except admits there were conversations between Mr. Kotzen and certain members of NCR's Board of Directors in or around late 2017 and early 2018.

74.     Defendant denies the allegations in paragraph 74, except admits that a meeting took place in early February 2018, between BCG and members of NCR's Board of Directors, during which Mission One was discussed.

75.     Defendant denies the allegations in paragraph 75, except admits that in early February 2018, BCG conducted a call with members of the NCR Board of Directors, during which the Services Business was discussed.

76.     Defendant denies the allegations in paragraph 76, except admits that on or around February 16, 2018, Mr. Benjamin presented to the NCR Board of Directors, including on the Services Business and the Mission One program.

77.     Defendant denies the allegations in paragraph 77.

78.     Defendant denies the allegations in paragraph 78, except admits that Mr. Benjamin terminated several employees of NCR, including Rick Marquardt.

79.     Defendant denies the allegations in paragraph 79, except admits that in a Form 8-K on March 22, 2018, Mr. Nuti's retirement was officially announced, and refers to that document for its contents.

80.     Defendant denies the allegations in paragraph 80, except admits that Mr. Benjamin's resignation and Mr Nuti's retirement were announced in a Form 8-K on March 22, 2018, and refers to that document for its contents.

81.     Defendant denies the allegations in paragraph 81, except admits that Mr. Michael Hayford was appointed as CEO of NCR on April 30, 2018, and Mr. Owen Sullivan was appointed COO of NCR on July 23, 2018.

82.     Defendant denies the allegations in paragraph 82, except admits that Mr. Michael Hayford was appointed as CEO of NCR on April 30, 2018; Mr. Owen Sullivan was appointed COO of NCR on July 23, 2018; Mr. Bob Ciminera assumed the role of EVP of Services on February 9, 2018; and Mr. Andre Fernandez was appointed CFO of NCR on August 29, 2018.

83.     Defendant denies the allegations in the first and second sentences of paragraph 83, except states it is without knowledge or information sufficient to form a belief as to the truth of what BCG learned.  Defendant denies the allegations in the third sentence, except admits that on or around July 25, 2018, Mr. Ciminera presented to the NCR Board of Directors on the status of Mission One.  Defendant denies the allegations in the fourth and fifth sentences of paragraph 83.  The allegations in the sixth sentence of paragraph 83 are legal argument, which do not require a response.  To the extent a response is required, Defendant denies the allegations.

84.     Defendant denies the allegations in paragraph 84, except admits that in January 2018, NCR launched its People 2020 Program, and refers to the Activity Based Organization Project Confirmation Letter dated April 30, 2019, ("ABO Letter") for its contents.

85.     Defendant admits the allegations in the first and third sentences of paragraph 85, and denies the allegations in the second sentence of paragraph 85.

86.     Defendant denies the allegations in paragraph 86, and refers to the ABO Letter for its contents, except admits that BCG emailed Ms. Ledford regarding the ABO Project in April 2018, and refers to that document, attached as Exhibit C to the Complaint, for its contents.

87.     Defendant denies the allegations in paragraph 87, except admits that on or around May 15, 2018, Ms. Ledford instructed BCG to cease work on the ABO Project; admits that BCG sent NCR an invoice in connection with the ABO Project, and refers to that document for its contents; and avers that in late April 2019, BCG agreed that NCR need not pay on that invoice.

88.     Defendant denies the allegations in paragraph 88, except admits that NCR's CEO Mr. Hayford met with BCG in September of 2018.

89.     Defendant denies the allegations in paragraph 89.

90.     Defendant denies the allegations in paragraph 90, except admits that on September 25, 2018, Mssrs. Hayford, Sullivan and Ciminera had a meeting with Mr. Kotzen and Mr. Gilliland of BCG to discuss Mission One.

91.     Defendant denies the allegations in paragraph 91, except admits the existence of the Statement of Work, and refers to that document for its contents; admits that BCG claimed non-compliance with the Statement of Work by NCR; and admits that BCG objected to NCR's decision to reorganize its business segments from solutions-based to industry-based.

92.     Defendant denies the allegations in paragraph 92, except admits that meetings took place between the Parties in 2018 and 2019, and BCG proposed that certain members of NCR serve on the GMI Review Committee; and admits the existence of the Statement of Work, and refers to that document for its contents.

11

93.     Defendant denies the allegations in paragraph 93.

94.     Defendant denies the allegations in paragraph 94, except admits that members of BCG met with Mr. Fernandez on December 5, 2018.

95.     Defendant denies the allegations in paragraph 95, except admits that Mr. Davis of BCG sent an email to members of NCR on December 21, 2018 and refers to the document for its contents.

96.     Defendant denies the allegations in paragraph 96.

97.     Defendant denies the allegations in paragraph 97, except admits that a meeting scheduled for January 18, 2019, was canceled due to a calendaring error that was communicated to BCG, and admits that Mr. Suresh told BCG that he, as CFO of the relevant business, would participate in the committee meetings, instead of Mr. Fernandez, the CFO of the company.

98.     Defendant denies the allegations in paragraph 98.

99.     Defendant denies the allegations in paragraph 99, except admits that BCG and NCR initially agreed on Risk/Gain Sharing Fees in the amount of $2.1 million for Q2 and Q3 2018 subject to further adjustments; admits that on December 5, 2018, NCR submitted a purchase order for approximately $2.1 million for Q2 and Q3 2018, and refers to that document for its contents; and admits that BCG submitted an invoice for approximately $2.1 million on December 7, 2018, and refers to that document for its contents; and further avers that the Parties did not reach agreement on the further adjustments.

100.    Defendant denies the allegations in paragraph 100, except admits that NCR initially approved an invoice amount of $5.4 million subject to further adjustments; admits that on April 12, 2019, BCG submitted an invoice for approximately $5.4 million, and refers to that

document for its contents; and avers that the Parties did not reach agreement on the further adjustments.

101.    Defendant denies the allegations in paragraph 101, except admits that NCR initially approved an invoice amount of $4.339 million subject to further adjustments; admits that on May 22, 2019, BCG submitted an invoice for approximately $4.3 million, and refers to that document for its contents; and avers that the Parties did not reach agreement on the further adjustments.

102.    Defendant denies the allegations in paragraph 102, except admits that on September 3, 2019, BCG sent NCR an invoice for Q2 2019 and the Parties did not reach an agreement on the amounts due.

103.    Defendant denies the allegations in paragraph 103.

104.    The allegations in paragraph 104 state a legal conclusion to which no response is required.  To the extent a response is required, Defendant denies the allegations.

105.    Defendant denies the allegations in paragraph 105, except admits the existence of the Statement of Work, and refers to that document for its contents, and admits that on or around August 6, 2019, a member of BCG emailed a member of NCR requesting information about capital expenditures.

106.    The allegations in paragraph 106 state a legal conclusion to which no response is required.  To the extent a response is required, Defendant denies the allegations.

107.    Defendant denies the allegations in the first, second and third sentences of paragraph 107, except admits that beginning in 2000, NCR began to transition from a manufacturing company into a software company through a series of strategic software acquisitions.  Defendant denies the allegations in the fourth sentence of paragraph 107, except

admits that on or around March 19, 2019, Standard & Poor's and Moody's Investors Service released certain press releases concerning NCR debt, and refers to those documents for their contents.

108.    The allegations in paragraph 108 state a legal conclusion to which no response is required.  To the extent a response is required, Defendant denies the allegations.

109.    Defendant denies the allegations in the first sentence of paragraph 109.  The allegations in the second and third sentences of paragraph 109 are legal arguments that do not require a response, to the extent a response is required, Defendant denies the allegations.

110.    Defendant denies the allegations in paragraph 110, except admits that an NCR Q4 2017 earnings call took place on February 8, 2018, and refers to the transcript of that call for its contents.

111.    Defendant denies the allegations in paragraph 111, except admits that NCR earnings calls took place in May and July 2018, and refers to the transcripts of those calls for their contents, and further admits that Defendant submitted public filings with the SEC for fiscal quarters June 30, 2018 and September 30, 2018, and refers to those documents for their contents.

112.    Defendant denies the allegations in paragraph 112, except admits that an NCR Q3 2018 earnings call took place on October 30, 2018, and refers to the transcript of that call for its contents.

113.    Defendant denies the allegations in paragraph 113, except admits that an NCR Q4 2018 earnings call took place on February 7, 2019, and refers to the transcript of that call for its contents.

114.    Defendant denies the allegations in paragraph 114, except admits that Defendant filed a Form 10-Q for the quarter ending on September 30, 2018, and refers to that filing for its contents.

115.    Defendant denies the allegations in paragraph 115, except admits that an NCR Investor Day presentation took place on November 7, 2018.

116.    Defendant denies the allegations in paragraph 116, except admits that NCR makes statements to investors from time-to-time, and refers to those statements for their contents.

117.    Defendant denies the allegations in paragraph 117.

118.    Defendant denies the allegations in paragraph 118.

119.    Defendant denies the allegations in paragraph 119, except admits that Mr. Davis and Mr. Sullivan met on April 23, 2019.

120.    Defendant denies the allegations in paragraph 120, except admits that Mr. Ciminera and Dr. Gilliland met on June 6, 2019.

121.    Defendant denies the allegations in paragraph 121, except admits that on June 11, 2019, Aviel Marrache from BCG emailed Mr. Ciminera regarding invoices, and refers to that document for its contents.

122.    Defendant denies the allegations in paragraph 122, except admits that on June 17, 2019, Mr. Davis and Dr. Gilliland attended a meeting with Mr. Ciminera during which the Parties discussed certain invoices that BCG had sent to NCR.

123.    Defendant denies the allegations in paragraph 123, except admits that Mr. Ciminera and Dr. Gilliland spoke on the phone on July 11, 2019.

124.    Defendant denies the allegations in paragraph 124, except admits that a call took place between NCR's and BCG's finance departments on or around July 16, 2019, and that Mr.

Ciminera and Dr. Gilliland met on July 17, 2019, and avers that in these meetings it became clear the Parties were very far apart on their view of the amount in fees to be paid and the method for calculating the amount.

125.     Defendant denies the allegations in paragraph 125, except admits that following the meetings with Mr. Ciminera and members of BCG, certain invoices posted to NCR's payment portal were canceled.

126.     Defendant denies the allegations in paragraph 126, except admits that Mr. Ciminera and Dr. Gilliland met on July 17, 2019.

127.     Defendant denies the allegations in paragraph 127, except admits that Mr. Ciminera and Dr. Gilliland met on July 23, 2019.

128.     Defendant admits the allegations in paragraph 128.

## COUNT ONE

129.     Defendant repeats its responses to the allegations in paragraphs 1-128.

130.     Defendant states that the allegations set forth in paragraph 130 are legal conclusions to which no response is required.

131.     Defendant denies the allegations in paragraph 131, and refers to the Statement of Work for its contents.

132.     Defendant denies the allegations in paragraph 132.

133.     Defendant denies the allegations in paragraph 133.

134.     Defendant denies the allegations in paragraph 134.

135.     Defendant denies the allegations in paragraph 135.

## COUNT TWO

136.     Defendant repeats its responses to the allegations in paragraphs 1-135.

137.    Defendant states that the allegations set forth in paragraph 137 are legal conclusions to which no response is required.  To the extent a response is required, Defendant denies the allegations of paragraph 137.

138.    Defendant denies the allegations in paragraph 138, and refers to the ABO Letter for its contents.

139.    Defendant denies the allegations in paragraph 139, and is without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 139, and refers to the ABO Letter for its contents.

140.    Defendant admits the allegations in paragraph 140.

141.    Defendant denies the allegations of paragraph 141, except admits that BCG has requested payment in connection with the ABO Project.

142.    Defendant denies the allegations in paragraph 142.

143.    Defendant denies the allegations in paragraph 143.

144.    Defendant denies the allegations in paragraph 144.

## COUNT THREE

145.    Defendant repeats its responses to the allegations in paragraphs 1-144.

146.    Defendant denies the allegations in paragraph 146.

147.    Defendant denies the allegations in paragraph 147.

148.    Defendant denies the allegations in paragraph 148.

149.    Defendant denies the allegations of paragraph 149.

## COUNT FOUR

150.    Defendant repeats its responses to the allegations in paragraphs 1-149.

151.     Defendant states that the allegations set forth in paragraph 151 are legal conclusions to which no response is required.

152.     Defendant denies the allegations in paragraph 152, and refers to the Statement of Work for its contents.

153.     Defendant denies the allegations in paragraph 153, and refers to the Statement of Work for its contents.

154.     Defendant denies the allegations in paragraph 154.

155.     Defendant denies the allegations in paragraph 155.

156.     Defendant denies the allegations in paragraph 156.

## PRAYER FOR RELIEF

157.     Defendant denies that Plaintiff is entitled to any of the relief requested in paragraph 157.

158.     Defendant denies that Plaintiff is entitled to any of the relief requested in paragraph 158.

159.     Defendant denies that Plaintiff is entitled to any of the relief requested in paragraph 159.

160.     Defendant denies that Plaintiff is entitled to any of the relief requested in paragraph 160.

161.     Defendant denies that Plaintiff is entitled to any of the relief requested in paragraph 161.

162.     Defendant denies that Plaintiff is entitled to any of the relief requested in paragraph 162.

## GENERAL DENIALS

Except as otherwise expressly admitted in paragraphs 1 through 162, above, Defendant NCR denies each and every allegation contained in paragraphs 1 through 162 of Plaintiff's Corrected Complaint, dated November 1, 2019 including, without limitations, the headings and subheadings contained in the Complaint, and specifically denies liability to Plaintiff, or that Plaintiff has suffered any legally cognizable damages for which Defendant is responsible.

## AFFIRMATIVE AND OTHER DEFENSES

Defendant expressly reserves the right to supplement, amend or delete any or all of its Answer, as warranted by discovery or other investigation, or as justice may require. Defendant asserts the following affirmative and other defenses.  In asserting these defenses, Defendant does not assume the burden of proof with respect to any issue as to which applicable law places the burden of proof upon Plaintiff.  Defendant expressly reserves the right to supplement, amend or delete any or all of the following defenses, as warranted by discovery or other investigation, or as justice may require.

## FIRST DEFENSE

Plaintiff's claims are barred, in whole or in part, on the grounds that Plaintiff fails to state a claim upon which relief may be granted.

## SECOND DEFENSE

Plaintiff's claims are barred, in whole or in part, by the limitation of liability provisions in the Statement of Work.

19

## THIRD DEFENSE

Plaintiff's claims are barred, in whole or in part, on the grounds that Plaintiff materially breached its representations, warranties and/or obligations under the Statement of Work, for the reasons stated in Defendant's counterclaims below.

## FOURTH DEFENSE

Plaintiff's claims are barred, in whole or in part, because the ABO Letter is not a valid, binding or enforceable agreement and was never countersigned by NCR.

## FIFTH DEFENSE

Plaintiff's claims are barred, in whole or in part, by the doctrine of waiver, as Plaintiff waived any payment in connection with People 2020 and had agreed, through intentional conduct, to forego certain provisions within the Statement of Work.

## SIXTH DEFENSE

Plaintiff failed to mitigate damages throughout the alleged period of harm.

## SEVENTH DEFENSE

Plaintiff has been unjustly enriched under the Statement of Work.  Defendant has made payments in excess of $9 million to Plaintiff, which BCG was not entitled to for all the reasons stated in Defendant's counterclaims.

## EIGHTH DEFENSE

Plaintiff's claims are barred, in whole or in part, because any recovery by Plaintiff should be precluded or diminished under the principles of recoupment and/or set-off.  Defendant has already paid Plaintiff over $9 million in fees.

## NINTH DEFENSE

Plaintiff's claims are barred, in whole or in part, because of unilateral or mutual mistake with respect to certain terms within the Statement of Work.  For example, the Baseline Adjusted Gross Margin fails to take into account certain items, such as depreciation and amortization, which the Parties had explicitly agreed should be excluded from the baseline.

## TENTH DEFENSE

Plaintiff cannot recover in equity under the doctrine of unclean hands, for all the reasons stated in Defendant's counterclaims.

## ELEVENTH DEFENSE

Plaintiff's claims are barred, in whole or in part, for the reasons set forth in NCR's counterclaims filed herewith.

## TWELFTH DEFENSE

Plaintiff cannot recover on both breach of contract and unjust enrichment claims. To the extent the contract is valid, an unjust enrichment claim is improper.

## PRAYER FOR RELIEF

WHEREFORE, NCR respectfully requests that the court enters judgment:

A.      Dismissing the Corrected Complaint with prejudice,

B.      Awarding costs and such other and further relief as the Court deems just and proper.

## COUNTERCLAIMS

Defendant and Counterclaim-Plaintiff NCR Corporation ("NCR"), by and through its undersigned attorneys, brings the following counterclaims against Plaintiff and Counterclaim-Defendant The Boston Consulting Group, Inc. ("BCG"), based upon knowledge with respect to its own acts and upon information and belief as to all other matters, and states as follows:

## NATURE OF THE ACTION

1.     BCG and NCR entered into a contractual and fiduciary relationship in order to improve the performance of NCR's Services Business for the benefit of its shareholders, employees and customers.  While BCG promised to act as NCR's "partner", and to create hundreds of millions of dollars of new profitability, BCG consistently put its own interests ahead of NCR's.  BCG not only failed to deliver on its promises to NCR but it also took steps to frustrate NCR's success—including by helping a key NCR executive to find new employment elsewhere, and pushing for the termination of NCR employees who questioned BCG's influence at the company.

2.     BCG's promises of millions of dollars of incremental value were met with skepticism from those familiar with NCR's Services Business.  But BCG had a powerful accomplice within NCR:  Mark Benjamin, NCR's former Chief Operating Officer ("COO"), who pushed through BCG's Statement of Work and, in collaboration with BCG, quashed opposition within NCR, saddling NCR with the onerous, unreasonable terms proposed by BCG—including an agreement to pay BCG approximately $20 million even if it brought no value to the business *at all*.  Because some at NCR had hoped that over time, Mr. Benjamin would prove himself a worthy successor to NCR's then-Chief Executive Officer ("CEO"), Bill Nuti, whose health was declining, Mr. Benjamin and his allies at BCG were allowed great leeway to take action

represented by them to be for the benefit of NCR and its shareholders.  As it turned out, Mr. Jeff

Kotzen, a Senior Partner at BCG, and Mr. Benjamin cooperated to take advantage of NCR's trust

and engaged in an arrangement benefiting BCG and Mr. Benjamin's own self-interest to the

detriment of NCR.

       3.      By 2016, when Mr. Benjamin joined NCR, its Services Business was already

successfully implementing several initiatives intended to improve its profitability for years to

come.  Nonetheless, Mr. Kotzen and Mr. Benjamin saw an opportunity to use the Services

Business for their mutual benefit and seized it.  Specifically, Mr. Kotzen and Mr. Benjamin

(nominally on behalf of NCR) agreed on a project purportedly intended to "transform" the

Services Business, promising NCR's executives that BCG would deliver hundreds of millions in

gross margin improvement and $1 billion in Net Present Value ("NPV").  As compensation,

BCG claimed that while it would be paid large fees, as well as a discretionary bonus, BCG

would be entitled to meaningful sums if—*and only if*—the gross margins of the Services

Business grew substantially over time.  In fact, however, BCG's promises were unrealistic, and

the Statement of Work contemplated the payment of tens of millions in fees even if the Services

Business hit its then-projected growth, irrespective of any work performed by BCG.

       4.      Naturally, many at NCR questioned the wisdom of the BCG engagement, and

specifically the large fees BCG could earn for improvements in NCR's results that had nothing

to do with BCG's services.  But Mr. Benjamin repeatedly shut down anyone who questioned the

terms of the BCG engagement, reprimanded subordinates who tried to escalate their concerns

and repeatedly represented to the ailing Mr. Nuti that the terms of the BCG engagement were

both favorable to NCR and a "done deal".  Indeed, rather than trying to address the concerns

raised by the people most familiar with the Services Business, BCG and Mr. Benjamin sought to

terminate them, with BCG actively identifying and proposing to Mr. Benjamin candidates to replace any manager who voiced opposition to the BCG engagement.

5.    Upon information and belief, in return for Mr. Benjamin's efforts in securing this lucrative engagement for BCG, BCG would fully support Mr. Benjamin's campaign to become CEO of NCR sooner rather than later—indeed, within months.  Upon information and belief, had Mr. Benjamin's campaign been successful, he would have approved the payment by NCR to BCG not only of the exaggerated fees agreed to under the Statement of Work, but also of the "discretionary bonus" contemplated therein.

6.    In the fall of 2017, in connection with NCR's strategic planning process for 2018, members of NCR's Board of Directors, which had not been made previously aware of the BCG engagement, became concerned, and directed their inquiries to Mr. Benjamin, the executive sponsor of the engagement.  Rather than addressing these inquiries himself with the help of his reports within the Services Business, Mr. Benjamin provided confidential inquiries from the NCR Board directly to Mr. Kotzen, enlisting Mr. Kotzen and BCG to draft for him responses, emails, talking points and presentations to the Board and to his fellow NCR executives, some of which were blatantly misleading.

7.    Moreover, in early February 2018, Mr. Benjamin arranged for Mr. Kotzen and other BCG executives to make a presentation to members of the NCR Board.  In that presentation, the contents of which were pre-approved by Mr. Benjamin, BCG touted Mr. Benjamin's efforts in spearheading the BCG engagement and his vision for NCR's business, disparaged Mr. Nuti's leadership, and recommended to the Board that it immediately terminate Mr. Nuti and replace him with Mr. Benjamin as CEO of the company (thereby all but

guaranteeing that BCG would earn a "discretionary bonus" for its efforts, regardless of its paltry results).

8.  Ultimately, this brazen behavior backfired.  Appalled at the unprecedented request that the NCR Board terminate Mr. Nuti as CEO, the Board undertook an internal investigation of the BCG engagement.

9.  Realizing that the Board's investigation would put his candidacy for CEO of NCR in jeopardy, Mr. Benjamin pursued a "plan B".  Specifically, while still engaging in an effort to replace Mr. Nuti at NCR and justify the BCG engagement, Mr. Kotzen and Mr. Benjamin sought an escape route for Mr. Benjamin from NCR, *i.e.*, a path for him to terminate his employment at NCR and jump ship to become CEO of another public company.  Mere weeks after Mr. Kotzen represented to the NCR Board that BCG's expert view is that Mr. Benjamin's leadership was so crucial to the success of Mission One and NCR's future that NCR had to crown him CEO *immediately*, Mr. Kotzen explored Mr. Benjamin's prospects at a different company—Nuance Communications—and assisted Mr. Benjamin in presenting his candidacy to the leadership of *that* company.  In March 2018, a few months after the NCR Board began questioning the BCG engagement, Mr. Benjamin notified NCR of his resignation; three days later, Nuance Communications publicly disclosed that Mr. Benjamin would become its CEO.

10.  Since Mr. Benjamin's departure, BCG's failure to deliver on the promises it made has become abundantly clear.  None of the initiatives BCG had proposed delivered the extraordinary increase in NPV it had forecasted, and many have been proven unsustainable or detrimental to the business and had to be undone.  Nonetheless, BCG has tried to extract from NCR tens of millions of dollars in fees, touting successes that never materialized and conjuring up accounting adjustments that have no basis in the Parties' contract.

25

11.     NCR trusted and relied on BCG's promises that it would partner with NCR and help it "win big".  As a fiduciary of NCR, BCG owed a duty to NCR of full candor, including concerning its relationship with Mr. Benjamin.  BCG breached its fiduciary duty to NCR, and aided and abetted Mr. Benjamin in violations of his own fiduciary duties to NCR.  BCG also breached its contractual commitments as well as its duty of good faith and fair dealing by helping Mr. Benjamin to leave NCR after repeatedly representing to NCR that Mr. Benjamin was essential to the success of Mission One, the Services Business and NCR more broadly.  NCR would not have engaged BCG—let alone on the terms to which it had agreed—had it been aware of the interactions between Mr. Benjamin and BCG.  And NCR was severely damaged by BCG's conduct, which caused it to terminate valuable employees and disrupted its succession planning for Mr. Nuti.

## THE PARTIES

12.     NCR is a leading software, hardware and services provider to customers across the financial, retail, hospitality, telecommunications and technology industries, conducting business in 180 countries.  Specifically, NCR provides a comprehensive line of automated teller machines ("ATMs"), point of sale ("POS") terminals and POS software, innovative self-service kiosks such as self-checkout terminals, and various other POS hardware and software solutions, installation, maintenance, managed and professional services, as well as payment processing solutions.  NCR is incorporated in Maryland and has its principal place of business in Atlanta, Georgia.

13.     BCG is a management consulting firm offering expert consulting services in a broad range of industries.  BCG generates over $7.5 billion in revenue annually.  BCG is incorporated in Massachusetts and has its principal place of business in Boston, Massachusetts.

## JURISDICTION AND VENUE

14.     Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1332(a) because there is diversity of citizenship and the matter in controversy exceeds the sum of $75,000, exclusive of interests and costs.

15.     Venue is proper in this Court under the doctrine of ancillary venue and because both Parties regularly conduct business in the State of New York.

## STATEMENT OF FACTS

**A.     NCR's Services Business**

16.     NCR has historically offered its solutions to its customers through three primary industry-based business segments:  Banking, Retail and Hospitality.

17.     In 2016, at the direction of Mr. Nuti, NCR restructured its management model from industry-focused to solutions-focused, reorganizing its operations around three solutions: Hardware, Software and Services.  At the time, Mr. Nuti believed this reorganization would drive improved value for shareholders.

18.     Both before and since this restructuring, and for at least a decade, NCR's services offerings have developed to account for the constantly evolving digital marketplace.  Among other things, NCR offers cloud (or software-as-a-service) solutions, hosted services, and online, mobile and transactional services and applications.  Additionally, NCR has focused on expanding the resale of third party networking products and related service offerings to a broader base of customers in the telecommunications and technology sectors, as well as servicing third-party computer hardware from select manufacturers who value NCR's global footprint.

19.      Since at least 2015, NCR has undertaken multiple initiatives, developed internally and in cooperation with leading outside consultants, to improve the financial

performance of its services offerings across all industries.  As a result of these initiatives, and the

work and dedication of NCR's Services personnel, NCR's Services Business has consistently

improved, as NCR offered a higher mix of managed services, improved the business'

productivity and efficiency, expanded its remote diagnostics and repair capabilities and brought

about greater discipline in its product lifecycle management.  By the end of 2016, revenue from

the Services Business was up four percent as compared to its 2015 revenues, accounting for

approximately 35 percent of NCR's total revenue.  By 2017, independent of the BCG

engagement, the Services Business was expected to increase its gross margin by approximately

$70 million per year in 2017 through 2019.

**B.**     **BCG, with the Aid of Mr. Benjamin, Develops the Statement of Work**

20.     In early 2016, due to the declining health of Mr. Nuti, NCR conducted a search

for candidates who could potentially succeed to the role of NCR's CEO in the event that Mr.

Nuti was forced to step down.

21.     On September 21, 2016, NCR announced that Mr. Benjamin would join the

company as President and COO.  Mr. Benjamin was to become responsible for Sales, Industry

Solutions Management, Product Development, Services and Supply Chain Operations at NCR.

At the time, it was hoped that Mr. Benjamin would ultimately prove himself able to succeed Mr.

Nuti as CEO.

22.     Prior to joining NCR, Mr. Benjamin had spent twenty-four years working at

Automatic Data Processing, LLC ("ADP"), ultimately serving as President of ADP's Global

Enterprise Solutions division.  During his tenure at ADP, Mr. Benjamin developed a close

relationship with Jeff Kotzen, Managing Director and Senior Partner at BCG.

23.     At or around the time he joined NCR, Mr. Benjamin became aware of the multiple initiatives that NCR had already implemented to improve the Services Business, and that were expected to increase Services' gross margin by approximately $70 million per year.

24.     However, soon after he joined NCR, Mr. Benjamin engaged BCG and Mr. Kotzen as a consultant to NCR.  Upon information and belief, Mr. Kotzen and Mr. Benjamin had an arrangement whereby Mr. Benjamin would help BCG "sell" its ambitious and lucrative engagement at NCR, and Mr. Kotzen and BCG would assist and work to accelerate Mr. Benjamin's ascent to the role of CEO of NCR.

25.     Over the next several months, Mr. Kotzen and others from BCG met with Mr. Benjamin to discuss BCG's engagement by NCR.  Specifically, the project, ultimately identified as Mission One, was intended to implement new initiatives identified by BCG intended to improve the profitability of NCR's Services Business.

26.     From the outset, Mr. Benjamin made clear to his subordinates at NCR that it was not a matter of *whether* BCG would be hired to consult the Services Business, but rather a matter of *when* they would be retained.  For example, although Rick Marquardt, then-head of the Services Business, had general knowledge about the engagement, he was excluded from meetings between BCG and Mr. Benjamin regarding the scope and value of the intended project and he rarely communicated directly with BCG without Mr. Benjamin's involvement.  When Mr. Marquardt first met with BCG and expressed his concern to Mr. Benjamin that any new initiatives proposed by BCG would have very little impact in 2017, he was reprimanded by Mr. Benjamin.  On another occasion, when Mr. Marquardt suggested on a call with NCR and BCG team members that the terms of the agreement Mr. Kotzen had struck with Mr. Benjamin, *i.e.*, the Statement of Work ("SOW"), needed to be revised to better reflect the interests of NCR, Mr.

Benjamin cut him off, and subsequently chided Mr. Marquardt for raising his concerns, noting

that the Statement of Work was virtually a done deal.  When members of Mr. Marquardt's team

provided BCG with constructive feedback or critiqued BCG's ideas, BCG immediately

complained to Mr. Benjamin, and those members, as well as Mr. Marquardt, would receive

emails or calls chastising them for their remarks.

27.     Once BCG and Mr. Benjamin had reached an agreement in principle regarding

the terms of BCG's engagement, BCG drafted a Statement of Work, the terms of which were

unduly favorable to BCG.

28.     First, there were no details regarding deliverables.  While there were broad

descriptions of the types of initiatives that BCG would aim to implement, there were no specific

deadlines for when such deliverables would be executed, and there was no indication of who or

how many people from BCG would be staffed on the project or what specific areas of subject

matter expertise they possessed.  Several executives at NCR raised their concern about this lack

of clear deliverables, but Mr. Benjamin dismissed those concerns.

29.     Second, of the proposed initiatives, several were already "in flight", *i.e.,* had

already been implemented by NCR prior to BCG's engagement, and were projected to improve

the Services Business by approximately $70 million.

30.     Third, BCG's compensation would be based on gross margin improvements to the

Services Business beginning in the second quarter of 2017, without any clear accounting of the

improvements already in place independent of any work that BCG contemplated conducting.

Specifically, while BCG claimed that it would not earn substantial fees unless it delivered

significant incremental value, the Statement of Work BCG drafted contemplated that if NCR

merely hit its pre-engagement projected improvements for 2017-2018, BCG would be entitled to

30

approximately $20 million in fees—and BCG would be entitled to 50% of any further improvements above and beyond that number (up to a cap), even if that improvement had nothing to do with its work, *e.g.*, if the Services Business managed to land a major new customer.

31.     Fourth, any termination of the BCG engagement by NCR, at any point in time, automatically entitled BCG to *the greater of* either (A) the total of BCG's professional fees and related expenses up to the date of termination, less prior payments received by BCG or (B) the fixed fees of $8 million under the SOW plus any gain sharing earned from any improvements up to the date of termination and for a full year thereafter—again, even if BCG had not contributed anything to these improvements.  If, for example, NCR chose to terminate the Statement of Work a single day after it was signed in August 2017, BCG already would be entitled to approximately $14 million in professional fees.

32.     Finally, BCG proposed an onerous "Change in Control" provision that equated a change in control of NCR, *as well as the voluntary or involuntary departure of Mr. Benjamin from NCR*, with a termination of the agreement by NCR, with all the implications laid out above. In other words, BCG proposed that NCR agree to pay it tens of millions of dollars, potentially for nothing, should Mr. Benjamin's employment at NCR end for whatever reason, including if Mr. Benjamin left the company of his own volition.  In retrospect, the goal of this clause seems clear—to ensure that NCR could not terminate Mr. Benjamin without incurring a hefty penalty, ensuring that BCG and Mr. Benjamin would be in a position to quash any resistance to BCG's demands (as detailed below) and that Mr. Benjamin would be in a position to pay BCG the "discretionary bonus" proposed by BCG in the SOW.

33.     Although members of NCR's legal and finance teams were provided with the draft and raised objections, BCG falsely asserted it was BCG, not NCR, that was taking on a substantial risk—and further claimed that the incremental NPV it would deliver to NCR was about $1 billion.  Using these false projections, Mr. Benjamin made clear at every turn that the fundamental terms of the agreement were non-negotiable, ignoring virtually all input from NCR's senior leadership.  Indeed, while BCG demanded extensive financial data regarding the state of the Services Business in order to calculate the metrics, baseline and timing for tracking "profit improvement" to determine their fees, Mr. Kotzen, BCG and Mr. Benjamin joined forces to rebuff any attempt to change BCG's fee structure so that it *actually* aligned with the Services Business's then-expected profit improvement.

34.     Most notably, Mr. Marquardt and Stephen Lynch, then-Chief Financial Officer ("CFO") of the Services Business, continued to express their concerns that under the proposed fee structure, BCG would derive significant benefit from new significant customer contracts that were already signed prior to BCG's engagement, as well as from initiatives that were already in place, independent of any work performed by BCG under the SOW.  To account for these then-existing customers and initiatives, from the onset of the negotiations, Mr. Marquardt and Mr. Lynch attempted to negotiate a fee structure that would insulate the first $50-60 million of savings that the Services Business made *each year* from any calculation that would form the basis of BCG fees.  This would ensure that the improvement would not account for programs that were already "in flight" when Mission One went underway and BCG would not also get the benefit of revenue that it wasn't responsible for generating.

35.     NCR's former CFO, Bob Fishman, also pushed for any calculation of BCG's fees to be based on improvement in costs, rather than gross margin.  Alternatively, Mr. Fishman

proposed that some percentage of revenue growth be excluded from BCG's fee calculation. BCG never agreed to such proposals.

36.     In addition, Mr. Fishman suggested including a provision in the Statement of Work that would require BCG to commit a minimum number of high-level employees to Mission One at all times, so that the gain would at least in some way be tied to BCG's direct efforts.  All of these proposals were rejected, as Mr. Benjamin pressured NCR executives to move forward quickly, reiterating that despite any lingering concerns, "[he was] not renegotiating now".

37.     Rather than address the concerns raised by the senior managers of the Services Business, as early as March 2017, BCG began providing Mr. Benjamin with names of candidates to replace any manager who voiced opposition to the BCG engagement.  Indeed, BCG and Mr. Benjamin quashed any opposition to the engagement soon after the Statement of Work was executed.  In late October of 2017, Mr. Lynch, the CFO of the Services Business, was terminated.  A few months later, in January of 2018, Mr. Marquardt, who had likewise voiced concerns over the BCG agreement, was also terminated.  Importantly, even as BCG was identifying candidates to replace them, Mr. Marquardt and Mr. Lynch were both identified by BCG in the Statement of Work as the Services personnel who would engage with BCG on the day-to-day execution of the Mission One project—alongside Mark Benjamin.

38.     Despite BCG's and Mr. Benjamin's cooperation in ramming through the Statement of Work, one significant change was made to the draft proposed by BCG, namely the removal of the provision in the Statement of Work that would have in essence penalized NCR for any change in Mr. Benjamin's employment, even if Mr. Benjamin left the company voluntarily, potentially to the tune of tens of millions of dollars.  BCG claimed that this provision was

necessary to mitigate the risk BCG was purportedly taking if the project lost its executive sponsorship.  And for months, despite the objection of virtually every NCR senior-level employee involved in the project to this provision, BCG would not agree to its removal.  It was not until Mr. Nuti stated he would not execute the SOW unless the provision was taken out that BCG finally relented and agreed to its removal.  Upon information and belief, BCG insisted on keeping this provision in the Statement of Work as a form of insurance, to protect BCG's interests in obtaining inflated fees in addition to the discretionary bonus contemplated by the Statement of Work.

**C.**   **In The Statement of Work, BCG Purported to Create a Partnership with NCR**

39.     The Statement of Work, attached as Exhibit A to BCG's Complaint, was ultimately signed by NCR in late August 2017, and was backdated to June 22, 2017.

40.     In terms of size and potential exposure, the Statement of Work was unlike any other agreement for consulting services that NCR had ever entered into prior to the BCG engagement or since.  Yet Mr. Benjamin did not seek Requests for Proposals from other consulting firms, and BCG never provided (nor did Mr. Benjamin seek) comparable agreements in order to benchmark the fees contemplated by the Statement of Work.  In short, NCR had entered into this engagement based on the trust Mr. Nuti had in Mr. Benjamin and in BCG itself, given their repeated assurances and BCG's specific representations that BCG would succeed only if it brought about unprecedented success to NCR's Services Business in the form of $1 billion in incremental value.

41.     Specifically, in the Statement of Work, BCG represented that it was "deeply committed to. . . creating value for NCR", such that "NCR's success is BCG's success" and

promised to "deliver dramatic gross margin improvement . . . that is a source of advantage for NCR . . . while minimizing disruption to [NCR's] business".

42.     To that end, BCG repeatedly emphasized in the Statement of Work the "partnership" relationship between itself and NCR, pledging to NCR "in the spirit of true partnership" that it was "deeply committed to NCR's success and [would] work tirelessly to help NCR win in the market", and reassuring NCR that BCG was "confident that [BCG] can help [NCR] accomplish [NCR's] ambitious transformation objectives."

43.     To enable this partnership, BCG was allowed unprecedented access to NCR's internal workings.  The Statement of Work contemplated NCR giving BCG "[f]ull and direct access to Services systems, data sources, calendars, SharePoint sites and networks to obtain necessary data . . . related data and information across NCR business units . . .  Access to NCR staff across the globe (within a very short time period).  This includes, but is not limited to, participants for roundtable discussions, 1-on-1 interviews, ride-alongs / shadowing, data interpretation, systems usage and navigation."  The Statement of Work also required NCR to allow BCG to participate in "Services and NCR senior leadership meetings" so that BCG could "voice opinions in a timely manner on key decisions."

44.     Notwithstanding the skewed compensation mechanism in the Statement of Work, BCG included in the document their oft-stated claim that their goal is to create "one NCR/BCG Partnership . . . where if NCR wins big, then BCG wins".  As further explained below, however, BCG has taken all steps possible to ensure it wins big—even when it became abundantly clear that NCR will not.

**D.**     **BCG Attempted to Accelerate Benjamin's Elevation to CEO—and When That Failed, Assisted Him in Leaving NCR**

45.     Rather than creating a partnership between BCG and NCR, the months following the execution of the Statement of Work were marked by further tightening of the partnership between BCG and Mr. Benjamin.

46.     In the fall of 2017, as part of NCR's strategic plan process overview for 2018, NCR's Board of Directors first learned about the Statement of Work.  Individual Board members questioned BCG's potential fees and the relationship between those fees and the value actually created by BCG.  One Board member specifically asked Mr. Marquardt, then-head of the Services Business, to explain the numbers.  Mr. Marquardt, consistent with his prior opposition to the BCG engagement, voiced his skepticism about the value BCG could bring to the business after factoring out costs.  Soon thereafter, in January 2018, Mr. Benjamin summarily fired Mr. Marquardt, replacing him with Bob Ciminera, who until then led NCR's Hardware Business.

47.     In the following weeks, members of the NCR Board continued to question the circumstances surrounding the BCG engagement, the value it created for NCR, and the large financial liability it could entail.  Rather than address these questions with the help of his reports in the Services Business, Mr. Benjamin secretly turned to Mr. Kotzen for help addressing the Board members' concerns, essentially presenting to the Board not the view of the Services Business, but rather the views of BCG.

48.     Several weeks into the Board's inquiry, BCG was asked to present its work directly to several Board members.  On or around February 6, 2018, Mr. Kotzen provided Mr. Benjamin, for his review and pre-approval, with BCG's talking points for that presentation.  In these talking points, Mr. Kotzen and BCG purported to present their neutral, expert view based on their "deep experience with the Services Business".  Specifically, Mr. Kotzen heavily

criticized NCR's then-CEO, Mr. Nuti, for disagreeing with certain strategic recommendations made by Mr. Benjamin for NCR and Mission One.  BCG further criticized Mr. Nuti's style of leadership as "one of authoritative dictatorship" where he had "surrounded himself with weak leaders"—except for Mr. Benjamin.  BCG claimed that "[Mr. Nuti] wanted complete control" which purportedly "point[ed] to gaps in [Mr. Nuti's] leadership."

49.     Mr. Kotzen did not settle for disparaging remarks about NCR's ailing CEO. Instead, he went as far as spelling out his "expert" solution to the purported shortcomings of Mr. Nuti's leadership:  Mr. Nuti's immediate termination by the Board, and the immediate appointment of Mr. Benjamin as CEO of NCR.  According to Mr. Kotzen, this course of action would be the *only* way for NCR to realize its full potential.

50.     The talking points included no reference to Mr. Kotzen's ties with Mr. Benjamin, nor to BCG's apparent expectation that Mr. Benjamin, if appointed CEO, would pay BCG the "discretionary bonus" contemplated under the Statement of Work.

51.     Mr. Benjamin confirmed to Mr. Kotzen that he liked the talking points. Consequently, in early February 2018, Mr. Kotzen delivered these prepared talking points to members of the NCR Board, recommending that the Board immediately appoint Mr. Benjamin as CEO of NCR.  Several NCR Board members reacted negatively to Mr. Kotzen's presentation, with several Board members faulting Mr. Kotzen and BCG for this inappropriate request and at least two Board members hanging up on the call.  One of the two Board members who hung up is a former consultant who was appalled by BCG's behavior; the other member simply asked BCG whether the benefits it expected to contribute to Mission One were net of the costs invested to deliver such benefits, but this incited anger from Mr. Kotzen.

52.     Mr. Kotzen reported back to Mr. Benjamin on the presentation and the reactions of different Board members.  The next day, when Mr. Benjamin was approached by one Board member regarding the same presentation, Mr. Benjamin let Mr. Kotzen know that "he played dumb as [the Board member] can't know [Mr. Kotzen] shared with [Mr. Benjamin] for many obvious reasons."

53.     Throughout the following week, several members of BCG helped Mr. Benjamin to draft a presentation to give to the Board regarding the state of NCR's business, including the status of Mission One, and his plans if he were made CEO.  Again, rather than provide his own independent views of the project and the views of the Services Business, Mr. Benjamin relied on BCG who, in advance of the meeting, drafted, edited and sent multiple versions of the presentation to Mr. Benjamin for his review.  On or around February 16, 2018, Mr. Benjamin delivered this presentation to the NCR Board.  During this presentation, Mr. Benjamin informed the Board that Services' margins increased by 310 basis points between 2015 and 2017, failing to note that the bulk of this increase materialized before any BCG initiatives were implemented, let alone had any meaningful effect on the business.  Mr. Benjamin also spent time criticizing Mr. Nuti's leadership and explaining his vision for the company if he were appointed CEO.

54.     Upon learning more about the Statement of Work and BCG's fees, coupled with Mr. Benjamin's and Mr. Kotzen's requests to have the Board remove and replace Mr. Nuti with Mr. Benjamin as CEO, concern among several NCR Board members intensified.

55.     On February 17, 2018, Rick Clemmer, an NCR Board member, wrote to Mr. Benjamin to express his view that the Statement of Work was "outrageous", asking Mr. Benjamin to explain what benchmarking had been done before it was signed.  Once again, Mr. Benjamin immediately contacted Mr. Kotzen to ask for his help with a response to Mr. Clemmer.

Mr. Kotzen then ghost-wrote a draft response that heavily touted BCG's expertise and again reiterated the false promises of hundreds of millions in gains.  Specifically, Mr. Kotzen suggested that Mr. Benjamin tell Mr. Clemmer that BCG would not be paid any substantial amount unless NCR's *profit* increased by $100 million—a statement that misrepresents the Statement of Work (which speaks to gross margin, not profit).  Mr. Kotzen further suggested that the NPV of Mission One is $1 billion—an assessment that Mr. Kotzen must have known to be extremely unreasonable at the time.

56.     Despite BCG's and Mr. Benjamin's close collaboration, their efforts backfired. Prior to or around February 25, 2018, Mr. Benjamin learned that the NCR Board had engaged a leadership consulting firm to conduct a "360-feedback performance review" of Mr. Benjamin. Mr. Benjamin learned that as part of this review, Spencer Stuart would interview and poll at least fifteen of Mr. Benjamin's peers and direct reports, and would analyze Mission One and BCG's fees.  Faced with mounting questions and pressure over the terms of the BCG engagement, and realizing that his possible ascension to the role of CEO at NCR was in serious jeopardy, Mr. Benjamin once again turned to Kotzen and BCG for help—and once again, disregarding their duties to NCR, Mr. Kotzen and BCG obliged.

57.     By very early March 2018, if not before, notwithstanding BCG's prior statements in the Statement of Work and to the NCR Board that Mr. Benjamin was crucial to the success of Mission One and of NCR more broadly, Mr. Kotzen affirmatively undertook helping Mr. Benjamin terminate his employment at NCR and seek alternative employment at another public company.  Upon information and belief, Mr. Kotzen provided Benjamin with an analysis of a company that NCR had previously used as a subcontractor, Nuance Communications, and then assisted Benjamin in preparing his candidacy for the position of CEO at Nuance, including by

helping to prepare a presentation for Mr. Benjamin that contained NCR's confidential information. Apparently aware of the impropriety of their actions, upon and information and belief, Messrs. Kotzen and Benjamin moved their communications concerning Mr. Benjamin's attempts to secure new employment at Nuance to Mr. Benjamin's private email account, to conceal it from NCR.

58.     On or around March 2, 2018, as the 360 review was ongoing and Mr. Kotzen was helping Mr. Benjamin to identify and secure a CEO role at another company, Mr. Benjamin once again presented to members of the NCR Board on Mission One, as the Board continued to question the BCG engagement. Here again, Mr. Benjamin asked Mr. Kotzen to provide him with talking points, specifically regarding BCG's calculation of a $1 billion NPV for Mission One. Mr. Benjamin used Mr. Kotzen's talking points, as well as other materials that BCG pulled together, including informational videos regarding Mission One's launch and monthly Mission One newsletters, for his presentation to the Board, mentioning nothing about the concurrent job hunt being assisted, in large part, by BCG.

59.     On or around March 19, 2019, Mr. Benjamin presented an ultimatum to several NCR Board members: either he be made Chairman and CEO of NCR immediately, or he would leave the company. During this time, Mr. Kotzen continued to send Mr. Benjamin updated analyses of Nuance and BCG's "value creation" proposal to increase Nuance's Total Shareholder Return.

60.     On March 22, 2018, Nuance announced that Mr. Benjamin would become the new CEO of Nuance, effective April 13, 2018. Mr. Benjamin secured this new role with BCG's aid and assistance.

**E.**      **Mr. Benjamin Pressures NCR into Working with BCG on another Project**

61.      After the Statement of Work had been finalized, and prior to or around November 18, 2017, Mr. Benjamin pushed to involve BCG in yet another NCR engagement, in connection with an HR project known as People 2020.  On November 19, 2017, when Mr. Kotzen learned that Andrea Ledford, then-head of Human Resources at NCR, was also considering AlixPartners for the project, Mr. Kotzen stressed to Mr. Benjamin that it was important that he, not Ms. Ledford, decided which consultant was ultimately engaged, because Mr. Benjamin was the "President" and "should at least co-drive [the] decision".  That same day, Mr. Benjamin responded that Ms. Ledford "needs to feel like the owner on this, typical political crap."

62.      By early March of 2018, however, Mr. Benjamin was in fact pushing Ms. Ledford to engage BCG for the People 2020 project.  Here too, Mr. Benjamin, while pushing Ms. Ledford, was acting at the behest of Mr. Kotzen and BCG.  Thus, for example, Mr. Benjamin represented to Ms. Ledford that he was unaware of BCG's proposed fees for the project, and when Ms. Ledford disclaimed knowledge as well, Mr. Benjamin forwarded her response to Mr. Kotzen on March 5, 2018, stating, "Between us, FYI. Let's discuss fees before you present etc."  And five days later, when Mr. Kotzen sent Mr. Benjamin a working proposal of BCG's potential engagement for the People 2020 project, Mr. Benjamin told BCG to send the proposal to Ms. Ledford directly, without copying him, "as we should see what she does next."

**F.**      **NCR is Harmed by BCG's and Mr. Benjamin's Breaches of Fiduciary Duties**

63.      In late March 2018, shortly after Mr. Benjamin's departure, Mr. Nuti announced his resignation from NCR for health reasons.  In April 2018, NCR hired a new CEO, Michael Hayford.  In July 2018, NCR hired a new COO, Owen Sullivan.  And in August 2018, NCR hired a new CFO, Andre Fernandez.

64.     Upon the appointment of new executives, the NCR Board communicated to NCR's new leadership its concerns about the BCG engagement, as well as the Board's serious distrust of BCG's stated intentions under the Statement of Work and the value of its contributions to Mission One.

65.     Accordingly, the newly hired executives began reviewing the details of Mission One and scrutinizing the Statement of Work.  They also consulted employees who were involved in the early stages of the negotiations to learn the details surrounding the establishment of the fee structure and how gross margin was to be calculated given various adjustments called for by the Statement of Work.  NCR's new leadership also learned of the concerns that had been raised but summarily dismissed by BCG and Mr. Benjamin during that time.

66.     NCR's executives learned that there were several major discrepancies between the language and intent behind the Statement of Work, and how BCG sought to calculate its fees under the Statement of Work.  Since mid-2018 and throughout 2019, members of NCR's and BCG's finance teams discussed these discrepancies.  However, the Parties never came to an agreement regarding how to properly calculate the improvement in NCR's gross margin, as is required under the Statement of Work.

67.     For example, despite clear language in the Statement of Work that all margin calculations should "[e]xclude depreciation and amortization", it is indisputable that the Parties had not excluded depreciation and amortization from the baseline Adjusted Gross Margin ("AGM") in the Statement of Work, which was estimated at $608.5 million.  Properly excluding depreciation and amortization from the baseline would result in a baseline number that is materially higher—approximately $642.7 million.  Clearly, there is no basis for a calculation that *in*cludes depreciation and amortization in the baseline yet *ex*cludes these items when calculating

the adjusted gross margin improvement ("AGMI") in subsequent quarters, as this would result in an imaginary "gain" of over $30 million—and a corresponding windfall of up to $15 million to BCG.

68.     Similarly, NCR's P&L is affected by certain non-operational items, such as NCR's decision to take a one-time charge for certain Excess and Obsolete (E&O) Inventory, rather than account for it as a cost hitting its P&L over multiple quarters.  This change in accounting treatment of E&O inventory does not affect NCR's bottom line, but it affects Services' P&L and would therefore affect AGMI, if not properly excluded from the calculation. The Statement of Work does recognize that gross margin improvement must be adjusted for "one-time/non-recurring charges/*write-offs*/investments"; yet BCG was unwilling to agree to this adjustments and instead, BCG raised their own adjustments related to ongoing operations that are not characteristically adjusted for in calculating AGM under the SOW.

69.     To address these concerns, NCR's new executive leaders met with senior members at BCG a few times in late 2018 and 2019, yet BCG was unwilling to discuss these issues candidly and work with NCR to resolve them in good faith, despite its promises under the Statement of Work to act "in the spirit of true partnership".

70.     Moreover, since the hiring of NCR's new leadership, at every turn, BCG's conduct suggested that it was anything but "deeply committed to NCR's success".  For example, BCG vociferously objected to NCR's decision to undo the 2016 restructuring and revert back to an industry-based structure (*i.e.*, banking, hospitality, retail) focused on NCR's customers, even though the new leadership indicated that this reorganization would be (and has turned out to be) significantly better for the company as a whole.  BCG's objection was not focused on the well

being of NCR or its customers, but instead of a concern that the new structure might somehow take focus away from Services' revenue, and thus, BCG's fees.

71.     Similarly, and even more blatantly, BCG objected strongly to NCR's intent of lowering its margin improvement target for the Services Business, after it became apparent that the proposed target by BCG was not realistic or possible to achieve and several cost-cutting measures proposed by BCG were not sustainable, as they undermined customer satisfaction, thereby hurting the long term prospects of the business.  Again, BCG—which before Mission One claimed that the Services Business was overly-focused on hitting targets and cutting costs— objected to this remedial measure because it was more concerned about NCR's short term results, and the BCG fees they potentially could generate,  rather than the long term health of the business.

<u>**COUNT I**</u>
<u>**(Breach of Fiduciary Duty)**</u>

72.     Paragraphs 1 through 71 above are incorporated by reference as if fully set forth herein.

73.     BCG owed a fiduciary duty to NCR apart from the terms of the Statement of Work because of the relationship of trust and confidence that was established between the Parties.  BCG had near unfettered access to any and all of NCR's resources.  BCG invited NCR to rely, and NCR did rely, on BCG's expertise and supposed integrity, and on its stated intent to be faithful to a partnership committed first and foremost to the success of NCR.  Specifically, NCR placed great trust and confidence in BCG's pledge that BCG would only "win big" if NCR won big, and that the Parties were both working toward a shared goal of driving profit improvement or $1 billion in NPV, which would serve NCR's best interests.

74.     BCG had considerable independence and discretion under the Statement of Work. NCR depended on BCG to assess the value of programs it was instituting, track their progress and make honest, expert recommendations on what needed to change and eventually implement those changes.

75.     BCG breached its fiduciary duty to NCR, including at least by failing to disclose that it had an arrangement with NCR's COO, Mr. Benjamin, that was not in NCR's best interest; by promoting Mr. Benjamin to the role of CEO without disclosing to NCR any understanding, arrangement or agreement it had with Benjamin; by supporting Mr. Benjamin, in his personal capacity, both in his engagements with members of NCR's Board and in his engagements with third parties including Nuance Communications.  BCG's relationship with Mr. Benjamin undermined and ran counter to BCG's commitments to NCR to work as NCR's partner and drive value for the company.

76.     Had BCG disclosed to NCR that it was working on behalf of Mr. Benjamin, NCR would not have trusted that BCG or Mr. Benjamin had NCR's best interests in mind, and NCR would not have placed its trust and confidence in BCG to carry out its commitments under the Statement of Work.

77.     As a direct and proximate result of BCG's breach of fiduciary duty, NCR suffered and will suffer substantial damages.

## COUNT II
### (Aiding & Abetting Breach of Fiduciary Duty)

78.     Paragraphs 1 through 77 above are incorporated by reference as if fully set forth herein.

79.     As President and COO of NCR, Mr. Benjamin owed fiduciary duties to NCR, including the duty of loyalty.

80.     Mr. Benjamin breached his fiduciary duty by, among other things, causing NCR to enter into the Statement of Work, and by remaining NCR's executive sponsor of the BCG engagement until his departure from NCR, without disclosing the understanding he had with Mr. Kotzen and BCG that BCG would support Mr. Benjamin in his personal capacity, despite the best interests of NCR, including in his endeavors promptly to become CEO of NCR and, ultimately, at another company.

81.     BCG knew that Mr. Benjamin owed a fiduciary duty of loyalty to NCR and aided and abetted Mr. Benjamin's breaches of his duty to NCR by knowingly and substantially assisting Mr. Benjamin in his pursuit of personal gain and ambition.

82.     As a direct and proximate result of BCG's actions in aiding and abetting the breach of a fiduciary duty by a corporate officer, NCR suffered and will suffer substantial damages.

## COUNT III
### (Breach of Contract)

83.     Paragraphs 1 through 82 above are incorporated by reference as if fully set forth herein.

84.     The Statement of Work between BCG and NCR, dated June 22, 2017, sets forth a valid and binding agreement for BCG's consulting services.

85.     At all times, NCR performed its obligations under the Statement of Work.

86.     Under the Statement of Work, NCR and BCG have an express obligation to work together as "partners".  BCG also pledged to be "deeply committed to NCR's success" and promised "to work tirelessly to help NCR win in the market".

87.     Mr. Benjamin was the executive sponsor of the Statement of Work, and BCG repeatedly informed NCR's executives and the Board that Mr. Benjamin was critical to Mission

One's success, and the success of NCR as a whole.  Thus, it was BCG's stated view that Mr. Benjamin's employment at NCR was a necessary predicate for NCR being able to "win in the market".

88.     Nonetheless, BCG actively helped Mr. Benjamin leave NCR for another public company, thereby undermining—in BCG's own view—NCR's ability to "win in the market" and to successfully execute the Mission One project contemplated in the Statement of Work.

89.     By the acts described above, BCG has materially breached its obligations under the Statement of Work by, for example, not working as NCR's partner and instead ensuring that NCR would not win in the market by helping the individual who was deemed so crucial to NCR's success leave the company.

90.     Furthermore, BCG expressly committed to "only use the confidential information it receives from NCR for the work it does under [the Statement of Work]" and that it would "keep this information confidential at all times".  Under these provisions, BCG has the specific implied contractual obligation not to use NCR's confidential information to prepare analyses or presentations that do not relate to the Statement of Work or to share this confidential information with third parties outside of NCR when doing so would deprive NCR of the benefits it was entitled to receive under the parties' agreement.  Nonetheless, on information and belief, BCG used confidential information it received from NCR to facilitate Mr. Benjamin's candidacy for employment at another company.

91.     By the acts described above, BCG has materially breached its obligations under the Statement of Work.

92.     As a direct and proximate result of BCG's breach, NCR suffered and will suffer substantial damages.

## COUNT IV
### (Breach of Implied Covenant of Good Faith and Fair Dealing)

93.     Paragraphs 1 through 92 above are incorporated by reference as if fully set forth herein.

94.     The Statement of Work between BCG and NCR, dated June 22, 2017, sets forth a valid and binding agreement for BCG's consulting services.

95.     At all times, NCR performed its obligations under the Statement of Work.

96.     Under New York Law, BCG impliedly covenanted to NCR that it would carry out its obligations under the Statement of Work in good faith and consistent with fair dealing practices.

97.     Pursuant to the Statement of Work, BCG has an express obligation "to work tirelessly to help NCR win in the market" and Mr. Benjamin was identified as an important participant in carrying out this promise.  In material violation of this implied covenant of good faith and fair dealing, BCG acted in bad faith and contrary to the best interests of NCR by helping Mr. Benjamin to find alternative employment and terminate his employment at NCR, including, for example, by facilitating his candidacy and ultimately helping to secure his position as CEO of Nuance Communications with the use of NCR's confidential information, which denied NCR of the benefits it was entitled to receive under the Parties' agreement.  As noted above, Mr. Benjamin was the executive sponsor of the Statement of Work, was supposed to be actively involved in carrying out the terms of the agreement, and was, according to BCG's own representations to NCR, integral to the success of Mission One.

98.     As a direct and proximate result of BCG's breach, NCR suffered and will suffer substantial damages.

## PRAYER FOR RELIEF

99.     WHEREFORE, NCR respectfully requests that this Court enter judgment:

A.      Declaring that BCG breached a fiduciary duty to NCR.

B.      Declaring that BCG aided and abetted a breach of fiduciary duty to NCR.

C.      Declaring that BCG materially breached the Statement of Work.

D.      Declaring, alternatively, that BCG materially breached the Statement of Work by breaching its duty of good faith and fair dealing.

E.      Awarding NCR all damages to which it is entitled concerning BCG's breach of contract, breach of the implied duty of good faith and fair dealing, breach of fiduciary duty and aiding and abetting a breach of fiduciary duty.

F.      Awarding costs and such other and further relief as the Court deems just and proper.

January 6, 2020

CRAVATH, SWAINE & MOORE LLP,

by

*/s/David Marriott*
David R. Marriott
Yonatan Even


Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
(212) 474-1000
dmarriott@cravath.com
yeven@cravath.com


*Attorneys for Defendant NCR Corporation*